John W. SIMPSON, Plaintiff-Appellant,

v.

SOUTHEASTERN INVESTMENT
TRUST, et al.,
Defendants-Appellees.

James R. WILLIS, Plaintiff-Appellant,

v.

SOUTHEASTERN INVESTMENT
TRUST, et al.,
Defendants-Appellees.

No. 81-3289.

United States Court of Appeals,
Fifth Circuit.

Feb. 14, 1983.

Sessions, Fishman, Rosenson, Boisfontaine & Nathan, Walter C. Thompson, Jr., New Orleans, La., for plaintiffs-appellants.

H. Gordon Hartman, New Orleans, La., for Buell C. Buchtel.

Tom H. Matheny, Hammond, La., for 1st Guar. & Rand Burris.

Macy, Kemp & McIntyre, Arthur W. Macy, Hammond, La., for C.D. Alford Partnership, et al.

Before GOLDBERG, GEE and HIGGINBOTHAM, Circuit Judges.

GEE, Circuit Judge.

In these two consolidated cases, plaintiffs charge defendants with securities fraud and seek recision and restitution plus reasonable attorneys' fees and expenses. The actions are brought pursuant to Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2); Section 17(a) of the Securities Act of 1933,

15 U.S.C. § 77q; Rule 10b–5 promulgated by the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5, pursuant to Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); and Section 715 of the Louisiana Blue Sky Law, La.R.S. 51:715.

## FACTS:

We adopt the factual statement written by the district court which is attached to this opinion as an appendix.

## SECTION 17(a)

 Plaintiff's claim under Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q, can be dismissed on the basis of this circuit's recent decision that no private right of action exists under this section. *Landry v. All American Assurance Co.,* 688 F.2d 381, 387–391 (5th Cir.1982).

## SECTION 12(2) AND RULE 10b–5

Section 12(2) of the Securities Act imposes liability on any person who offers or sells a security by means of

a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission)....[1]

15 U.S.C. § 77*l*(2).

Rule 10b–5 makes it unlawful for any person, in connection with a security transaction,

To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circum-

stances under which they were made, not misleading....

17 C.F.R. § 240.10b–5.

Materiality therefore is a necessary element in a cause of action brought under either Section 12(2) or Rule 10b–5. Because we find that plaintiffs have failed to prove that defendants committed any material misstatements or omissions under either of these provisions, we affirm the judgment below for defendants.

 Although this court has not yet seen fit to articulate precisely the same materiality standard for Section 12(2) and Rule 10b–5, we see no reason to recognize any distinction. The court below relied upon this circuit's definition of "material" adopted in the context of Section 12(2):

The term "material" when used to qualify a requirement for the furnishing of information as to any subject, limits the information required to those matters as to which an average prudent investor ought reasonably to be informed before purchasing the security registered. 17 C.F.R. 230, 405(1) (1971).

*Hill York Corp. v. American International Franchises, Inc.,* 448 F.2d 680 (5th Cir.1971).

We have also cited with approval a definition of materiality in the Section 12(2) context which states that,

an omission or misrepresentation of fact was material if, considering its full extent, including the subject matter and the relationship of the parties, the misrepresentation was of a fact which, considering [plaintiffs] as reasonable investors, would affect or influence them in determining whether to buy the [security].

*Gilbert v. Nixon,* 429 F.2d 348, 356 (10th Cir.1970), *cited in Hill York,* 448 F.2d at 696.

La.R.S. 51:715.

For the purposes of this opinion, treatment of plaintiff's claim under Section 715A is subsumed in our discussion of his Section 12(2) claim, because, as petitioner concedes in his brief, the pertinent portions of Section 715A are substantially similar to Section 12(2).

---

1. Section 715A of the Louisiana Blue Sky Law imposes liability upon any person who offers or sells a security

by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission)....

In the Rule 10b–5 context, we have borrowed the Supreme Court's definition of materiality adopted in the context of Section 14(a) of the 1934 Act, 15 U.S.C. § 78n(a), which regulates the disclosure of information in proxy statements. *Huddleston v. Herman & MacLean*, 640 F.2d 534, 543 (5th Cir.1981) *modified on denial of rehearing en banc*, 650 F.2d 815 (5th Cir. 1981), *cert. granted*, 456 U.S. 914, 102 S.Ct. 1766, 72 L.Ed.2d 173 (1982). The Supreme Court's definition relied on a "general standard of materiality": "An omitted fact is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding how to vote." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).[2]

We recognize no appreciable distinction between the standards for materiality articulated in the Section 12(2) and the Rule 10b–5 contexts. Furthermore, we perceive no reason there should be different standards; although they apply to different transactional settings and require distinct elements of proof, both statutory provisions rely on a common standard of material information. By material, both provisions intend to specify information which "would" be "important" to a potential investor's investment decision. Therefore, we reproduce a concise statement of the standard of materiality which we find applicable under both Section 12(2) and Rule 10b–5:[3]

In this circuit, the test of materiality is "whether a reasonable man would attach importance to the fact misrepresented in determining his course of action."[4]

*Huddleston*, 640 F.2d at 543 (10b–5 context) (quoting *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 603–04 (5th Cir.), *cert. denied*, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974)). *See Falls v. Fickling*, 621 F.2d 1362, 1365 n. 9 (5th Cir.1980) (10b–5 context).

■ This court has reviewed the myriad assertions of material misstatements and omissions cited by plaintiffs in this case, and we agree with the district court's finding that the vast majority of these are simply not "misstatements." Most of the statements cited by plaintiff as misleading, in fact, accurately represented the conditions of the investment as they existed at the time they were made. We also agree with the district court that to the extent that any of the information disclosed differed from the truth, these misstatements were not material. We see no reason to discuss each of plaintiff's specific allegations; instead, we have reproduced the district court's treatment of them, which we adopt with its statement of the facts in the appendix.

---

2. The issue in *Northway* was whether the proper standard for material information was information a reasonable investor "would" or "might" consider important. The Supreme Court selected the verb "would," sharing Judge Friendly's concern that the "might" formulation is "too suggestive of mere possibility, however unlikely." *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1302 (2d Cir.1973) (Section 14(a) context). All of the statements of the materiality standard we look at today respect this decision.

3. Although we decide today that in similar transactional settings the standard for materiality under Section 12(2) and Rule 10b–5 should be the same, we reserve judgment on the question whether this standard should be precisely the same if applied to a different type of fraud. The statement of materiality announced today, therefore, may apply only to the type of fraud between individuals found in the case before us, and not to other categories

of fraud such as, for example, those involving the concept of "fraud on the market."

4. This articulation of the materiality standard was born in the Restatement of Torts, § 538(2)(a) (1938). This statement of the standard also should apply in the context of Section 14(a) proxy statements. *See Huddleston*, 640 F.2d at 543 (borrowing materiality standard from the Section 14(a) context in the Rule 10b–5 context).

Other circuits have adopted a single test for materiality under Section 12(2) and Rule 10b–5. *See e.g., Austin v. Loftsgaarden*, 675 F.2d 168, 176 & n. 17 (8th Cir.1982) ("test for materiality is the same under all of the securities statutes") (citing *Alton Box Board Co. v. Goldman, Sachs & Co.*, 560 F.2d 916, 920 (8th Cir.1977); *Gilbert v. Nixon*, 429 F.2d 348, 355–56 (10th Cir.1970); *List v. Fashion Park, Inc.*, 340 F.2d 457, 462 (2d Cir.), *cert. denied*, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965).

We find the sole misstatement—the statement in the prospectus that Rand owned the land and building which constituted its facilities—not to be material. The prospectus reads, in relevant part,

> [i]f funds are available the Partnership may purchase Rand's existing land and building. . . . If Rand sells such land and building, the Partnership may purchase land with a suitable building or construct a building and lease the same to Rand.[5]

The district court found this statement to "imply" that Rand owned its land and building; it does imply this. Yet, Rand did not own this property but instead leased it on a month-to-month basis, with an option to purchase.

However, plaintiffs point to no reason why a reasonable investor "would" find the information represented by this misstatement "important" in determining whether or not to invest. The section of the prospectus in which this misstatement appears describes the proposed business of the Partnership. It states with certainty that the Partnership will purchase used machinery and equipment from Rand and lease this equipment back to Rand. This was the principal business of the Partnership. In addition, the prospectus refers to several potential business practices of the Partnership, including the suggestion that it "may" purchase Rand's property for lease back to Rand, "if funds are available."

From the point of view of a potential investor in the Partnership, the value of this business practice is not affected by the identity of the current owner of Rand's property.[6] It is conditioned only by the ability of the Partnership to acquire the property, if it perhaps decided to do so. The only guarantee that the property would

be available for sale to the Partnership is found in the implication that Rand owned it and the reasonable, albeit unstated, implication that Rand would be willing to make the property available should the Partnership choose to purchase it. Although Rand did not own the building, it did possess an option to purchase which provided the same assurance that Rand could make the property available for sale to the Partnership. Thus, the value of the misstatement to the Partnership, measured by the difference between the value of the information as stated and the value of the true set of facts, was not such that a reasonable investor would have considered it important in his decision to invest in the Partnership.

Because we have found no showing of a material misstatement or omission, and because a showing of materiality is a necessary element of a cause of action under Section 12(2), Section 715A, and Rule 10b–5, we rest our inquiry here and affirm the judgment below for defendants.

AFFIRMED.

## APPENDIX

The "securities" involved are interests purchased in the C.D. Alford Partnership in Commendam and the Southeastern Investment Trust, both of which have been named as defendants. The additional defendants are C.D. Alford, M.D., Julius J. Prokop, Jr., Paul H. Bowdle, Randy M. Burris, Scott W. Broome, Buell C. Buchtel, M.D., First Guaranty Bank of Hammond and Rand Laboratories, Inc. Alford, Burris and Buchtel were the trustees of the named Trust. Alford, Prokop and Broome were three of the four general partners of the named Partnership. The purchase price of most of the

---

**5.** The district court found, and petitioners do not take issue with the fact, that this misstatement was made "through inadvertance." Although this finding is not directly relevant to the decision in this case, we do note that the lack of any evidence that defendants were aware of the existence of this misstatement corroborates our finding that this misstatement was not material. The ownership of the property was not an aspect of the investment in the Partnership to which either sellers or purchasers attributed any significance, and it was never referred to outside this solitary and oblique reference to it in the prospectus.

**6.** At the time the prospectus was drawn up, plaintiffs were not considering investing in Rand; their investment at this time was solely in the Partnership whose prospective business was to lease equipment to Rand. The Trust, whose purpose was to invest in Rand, was not yet conceived.

securities purchased by the plaintiffs came from loans from the defendant First Guaranty Bank and were evidenced by two promissory notes from plaintiff Simpson and one from plaintiff Willis, which the plaintiffs seek to cancel and on which the defendant Bank has filed a counterclaim for their collection.

Prior to the formation of either the Partnership or the Trust, Dr. Alford, along with a number of doctors in his locality, were stockholders in a pharmaceutical company named Century Laboratories, Inc. Century moved its operations from Louisiana to New Jersey and, in the process, sold off the pharmaceutical manufacturing and sales portion of its operations, which was located at Veterans Memorial Boulevard, Metairie, Louisiana. Dr. Alford talked about attempting to buy it for almost a year and a half. As was subsequently stated in the Partnership Agreement, he was interested in forming a capital equipment company which would purchase machinery and equipment which would be used in the production of drugs, pharmaceuticals, chemicals, and the like. The pharmaceutical end of Century was purchased, however, by Mr. Bowdle, who changed its name to Rand Laboratories, Inc.[1]

At its inception, Rand Laboratories had a decent inventory and various patent rights which several persons, including Dr. Alford, were very enthusiastic about. These patent rights included methods of production of "urokinase," an enzyme derived from human urine, which was supposedly being developed for medical use in dissolving clots and embolisms in the body. Next, Rand was involved with a Dr. Sallman, at the University of Miami Medical School, in the development of an allegedly economically feasible method of manufacturing "cellulase," an enzyme produced by bacterial fermentation and used in the digestion of cellulose products, i.e., paper, wood and fibers. A third project was research work on "chitinase," an enzyme that digested crustacean shells and produced a valuable protein byproduct. In addition, Rand was supposedly moving ahead with a product named "Sprint," a high energy protein supplement which was ready for marketing and which was compared to "Gatorade." Moreover, the drug line purchased from Century was known to have generated up to a million dollar's worth of business and the potential remained with Rand. Based on the foregoing, Dr. Alford considered Rand a good drug company, with potential in research and development of new products. However, at the time that the Partnership was conceived, it was not the intention that the Partnership purchase Rand Laboratories, Inc., considered a completely separate entity from the Partnership. Initially, the Partnership was for the purpose of purchasing certain used machinery and equipment from Rand Laboratories for lease back to it. Investment in this Partnership was to have several advantages. The Partnership, upon purchase of the machinery and equipment, would have the security of tangible assets, these assets could be leased so that there was a potential source of revenue from rent with little or no expense, and a tax benefit to the partners, who could write off the depreciation of the machinery and equip-

---

1. The mechanics of the purchase were set forth in three sales agreements, which were executed on June 6, 1971, each of which purported to be independent and in no way conditioned upon the performance or nonperformance of each other. First, it was agreed that Rand would purchase all of the issued and outstanding shares of common stock of Carrtone Investment Corporation, a Century wholly-owned subsidiary which held the drug manufacturing facility in Metairie, Louisiana, for $300,000, on or before June 6, 1972. Pursuant to the second agreement, Century sold certain of its products, trade names, patent rights and good will to Rand. In exchange, Rand executed a 4% con-vertible subordinated note due June 1, 1981, in the amount of $500,000. Approximately a year later, on April 3, 1972, the company agreed to the settlement of this note for $100,000, plus accrued interest and 50,000 shares of Rand common stock. The third agreement provided for the sale to Rand of Century's business fixtures, machinery, furniture and other equipment used by it in its drug manufacturing operation in Metairie, Louisiana, for $350,000, payable on or before June 6, 1972, (later extended to July 6, 1972), with interest at 4% per annum. The major security for the purchase price was a mortgage from Rand on all the equipment purchased.

ment. The lease agreement, when written, did contain a provision for warrants to purchase Rand common stock, which meant that if the company should do well, partners could subsequently buy its stock. An additional aspect of this venture was to solicit mostly doctors who could advance the pharmaceutical end of the business by writing prescriptions for the brand of drugs it sold.

A prospectus for the Partnership, formed under a Partnership in Commendam Agreement, was submitted by Alford to the Commissioner of Securities, State of Louisiana, in connection with the "Application for the Registration of Commitments to Contribute Capital for Partnership in Commendam Interests in C.D. Alford, Partnership in Commendam." Initially, Alford, Prokop and Broome[2] were the general partners.[3] The prospectus was distributed prior to the sale of the limited partnership interests or units.

2. Alford was identified as a medical doctor specializing in obstetrics and gynecology, who was a shareholder in Rand and who would be elected a Director of Rand; Prokop as a certified public accountant, also a shareholder of Rand, who likewise would be elected a Director; Broome as a manufacturer's representative for Rand, also a shareholder of Rand but not a Director.

3. The Partnership later gained a fourth General Partner, Julian P. Rish, who was also named as a defendant in these suits but settled out with the plaintiffs shortly after trial began on terms unknown to the Court.

4. Although plaintiffs seek to paint all of this as some sort of clandestine arrangement, it was spelled out in the prospectus as follows:

INTEREST AND MANAGEMENT AND
OTHERS IN CERTAIN
TRANSACTIONS

On March 7, 1972, an agreement was signed between C.D. Alford, M.D., Jules Prokop, C.P.A. of Hammond, Louisiana, and Paul H. Bowdle of Metairie, Louisiana, President of Rand Laboratories, Inc., whereby the parties warrant that payment would be made to Century Laboratories, Inc., of Turnersville, New Jersey of $450,000.00 on or before June 6, 1972, in full satisfaction of Rand's obligation under an agreement by which Rand acquired certain used machinery and equipment on June 6, 1971 and as the entire cash settlement of a convertible note for $100,-000.00

It detailed the formation of the Partnership and the agreements reached between Alford, Prokop and Broome and Bowdle, as President of Rand, on March 7, 1972. Alford agreed to form a Partnership in Commendam, at that time, for the purpose of raising $1,000,000 of capital, to be realized from the sale of 200 partnership interests at $5,000 each. It was further agreed that these funds would be used to purchase equipment from Rand for $350,000. It also noted that Alford, Prokop and Bowdle warranted payment to Century Laboratories of $450,000, on or before June 6, 1972, in full satisfaction of Rand's obligation under the agreement by which Rand acquired the used machinery and equipment which the partnership sought, in turn, to purchase from Rand. It was noted that these had been purchased by Rand on June 6, 1971. The additional $100,000 was noted to be the entire cash settlement of a convertible note.[4]

The agreement specifies that Dr. Alford agrees to form a Partnership in Commendam for the purpose of raising One Million ($1,000,000.00) Dollars of capital with two hundred (200) partnership interests at Five Thousand ($5,000.00) Dollars each, and to act as its General Partner. The agreement further specifies that the funds will be used to purchase equipment from Rand at Three Hundred Fifty Thousand ($350,000.00) Dollars. Alford also agreed that if funds of the partnership are available, the building and land at 4936 Veterans Memorial Boulevard, Metairie, Louisiana belonging to Rand would also be purchased. Alford and Rand also agreed to the basic terms of the lease between Rand and the Partnership. The agreement further specifies that Bowdle shall be elected as President of Rand Laboratories, Inc., for a period of five years. Bowdle also agrees to vote his shares during the active life of the partnership for Alford and Prokop as members of the Board of Directors of Rand and thereafter for one member of the Board as designated by Alford for a period of five (5) years from the date of the agreement. In connection with this transaction, Alford and Prokop were permitted to purchase approximately 16% of Rand's existing outstanding equity.

Plaintiffs also complain of another series of transactions whereby Alford, Prokop and Bowdle, along with Century's president and certain of its directors, guaranteed a $400,000 loan for Century from the First Guaranty Bank. Century was in need of funds prior to receipt from

Although the general partners were enthusiastic and optimistic about the proposed venture, the prospectus was not. The fourth line of its caption on its title page read: "THIS INVESTMENT INVOLVES A HIGH DEGREE OF RISK." Directly beneath this disclosure, the prospectus stated: "Prior to this offering, there has been no public market for these units of Partnership interests. The Public offering price has been arbitrarily determined." Further down the page the following language occurs: "This offering involves the following: (a) SPECIAL RISKS CONCERNING THE COMPANY—See 'Introductory Statment [sic]—Risk Factors' on Page 2." The following are the risks which are enumerated on Page 2 of the prospectus:

2. *Risk Factors.*

Risk factors connected with this offering include the following:

(1) The public offering price has been arbitrarily determined.

(2) There is no market for the units of interest in the partnership and because of its nature, a market is not expected to develop as a result of this offering. Consequently, investors may not be able to realize upon their investment should they need or wish to do so for emergency purposes or otherwise.

(3) The partnership when formed will be newly organized without history or past business.

(4) Rand, the prospective lessee, has been operating as a pharmaceutical manufacturer less than one year and there is no assurance that the company will be successful in the highly competitive drug industry. Pharmaceutical manufacturers are also subject to federal and state regulations which are changing rapidly and which may deplete its product line. No market for Rand stock exists at present.

\* \* \* \* \* \*

(6) There can be no assurance of any return on the contribution even if 75 Units are sold.

(7) The type of business contemplated does not ordinarily earn profits from the outset primarily because of the heavy depreciation on the assets employed.

\* \* \* \* \* \*

(9) The General Partners have no previous experience in the venture in which they are about to undertake via this offering.

Before describing the Risk Factors, the Introductory Statement of the prospectus indicates that: "The offering is directed primarily to persons whose income is subject to Federal Income Taxes at high rates."

In further explanation of the principal business of the Partnership, that is, the purchase of machinery and equipment for the purpose of leasing them to a pharmaceutical company, the prospectus describes the proposed business in detail as follows:

The Partnership will initially acquire certain used machinery and equipment now owned by Rand and lease it back to Rand. If funds are available the Partnership may purchase Rand's existing land and building, located 4936 Veterans Memorial Boulevard, Metairie, Louisiana. If Rand sells such land and building, the Partnership may purchase land with a suitable building or construct a building and lease same to Rand. The Partnership may purchase other machinery and equipment for lease to Rand. In addition, the Partnership may acquire any other article or articles of value, improved or unimproved, for lease to others.

The prospectus also set forth the terms of the lease agreement of the property with Rand. It detailed another of the ideas behind the investment. The lease arrangement between Rand and the Partnership provided for a base rental fee for a ten-year period. In addition, it also provided that

Rand and in light of the fact that an anticipated underwriting of Century's stock did not go through when anticipated. We note, as pointed out by plaintiffs, that the loan was pinned to the Rand purchase and the funding of the partnership and deposit of partnership funds in an escrow account in the Bank. However, there is no indication that Century was not financially sound and, at any rate, the guarantors were completely released by August 8, 1972. There was no evidence of an effect on Rand or the partnership as a result of the transactions.

after the first year, Rand would also pay the Partnership 5% of its net sales of Rand trademarked products. This held out to prospective investors the hope of additional income if Rand did well in the future. At the time the prospectus was drawn up, the Trust had not been conceived and attention was focused on funding the Partnership for purchase of the property contemplated.

After commitments to invest in the Partnership were obtained, Alford formed the Partnership in July of 1972. He actually signed the "Articles of Partnership in Commendam" on July 10, 1972, under Article VI of which the formal existence of the Partnership was to begin upon the filing of the Articles. This occurred on July 14, 1972.

Plaintiff Simpson first heard about the Partnership from Dr. Alford, with whom he discussed it on several occasions. These discussions lasted over a two or three month period during the spring of 1972. Simpson actually committed himself to purchase into the Partnership, for two units at $5,000 each, early in the spring. He did so in spite of the fact that he had read the prospectus and was aware that it presented a very speculative investment. In addition, he accepted Dr. Alford's explanation that the warning that the investment was a "high risk" in the prospectus was only a statement required by law even though, as set forth above, the prospectus went into detail as to the nature of the risk. Simpson never asked specific questions about Rand's solvency nor asked to see a balance sheet on Rand, possibly because the prospectus stated that it was a new company. In order to induce him to invest in the Partnership, Alford told Simpson about Rand Laboratories' research and patent rights and that it was a good company, being managed by a Mr. Bowdle who had considerable experience in the manufacture and sale of drugs. Simpson also received verbal assurances from Mr. Broome. These included the allegation that there would be a public offering of Rand Laboratories stock in the near future. However, there was no evidence that Dr. Alford and Mr. Broome did not believe these statements, based on what they considered to be honest assurances from the president of Century that a New York broker had approved a million dollar underwriting for Rand.[5] Simpson did, at one point, call his broker and request information about Rand Laboratories, but in a subsequent return call he was informed by the broker that he could find nothing on the company. Two months after making the commitment to buy into the Partnership, on June 22, 1972, Simpson actually borrowed the money to complete the purchase from the First Guaranty Bank. He went to the Bank after receiving a call from Dr. Alford, who was considerably insistent that he consummate the purchase at that time. It was, at this time, against Simpson's better judgment to actually invest but he did so because of his friendship with Alford in that they had been resident doctors together for three years some fifteen years previously. Simpson used the First Guaranty Bank, through its vice president Randy M. Burris, on recommendation from Alford after he told Alford that he was not satisfied with the service from his own bank and asked Alford who he banked with. Having received the information from Alford, Simpson had previously spoken to Burris and established that he would be able to make the loan, to no surprise since, as a successful doctor, Simpson had good credit. There was no evidence that Burris or the Bank were necessarily anxious to lend the money for the purpose of seeing it invested in the Partnership.

5. These were not the only people who believed in the potential which Rand held for future financial success. Julian Rish (see fn. 3), a successful businessman with experience in the pharmaceutical business, had also been interested in purchasing the drug manufacturing portion of Century which was sold off. Since, to his knowledge, Century had been successful with this line prior to its acquisition by Bowdle, he felt that the potential was passed on. He proposed, and Bowdle accepted, an arrangement whereby Rish's company would market Rand's drug line. On the basis of this contract, the company borrowed approximately $45,000 to finance the development of a sales force. At the point that the arrangement came to an end, the company had created a demand for items which Rand could not supply.

The Trust was created after the Partnership. It was intended as a means of increasing the capital of Rand, so that there would be sufficient funds to continue the research, until Rand went public in the near future. And, also, since there was some dissatisfaction with the operation of Rand, it was also intended as a means of putting control of Rand in different hands. For each investment of $25,500, the Trust was to immediately purchase 10,000 shares of Rand's stock at $2.50 per share. As an added incentive to invest, the additional $500 was for the purchase of 2,500 bonus shares at 20 cents per share, which hopefully could be sold at a profit when the company went public. On September 19, 1972, Simpson and Willis purchased a beneficial interest in the Trust. They borrowed the sum of $25,500 each for the investment from the First Guaranty Bank, again through Burris, having by this time established a relationship there. Once again, Dr. Alford was the motivating party. He explained the necessity of raising the money for Rand Laboratories since the public offering did not appear to be as close as earlier anticipated. It appears, however, that Dr. Simpson was the first person to start to interest Dr. Willis in the Trust investment. Having indicated that he intended to invest in it, he recommended to Willis that he call Alford for more information. When Willis spoke to Alford, Alford reiterated much of what Simpson had told Willis and also was optimistic about it. Subsequently, however, a meeting was held to explain the Trust. Simpson did not attend this meeting, but Willis did and then reported back to Simpson. Bowdle spoke to the potential investors at this meeting. He spoke about the excellent prospects for Rand. There was also discussion of writing conditions onto the manner of disbursement of the money raised under the Trust to Rand to insure that it would be used properly. On December 31, 1972, at the urging of Alford and after having read the Partnership prospectus before investing in the Trust, Willis purchased one unit of the Partnership for $5,000. He did not borrow the money for this investment.

It appears that although there was much discussion about Rand prior to the time that investments were made in the Partnership or in the Trust, it was all with regard to the processes and patents which it owned, the potential which existed and the fact that investment into the Partnership had income tax advantages. No one asked to see a profit and loss statement on Rand or a list of its assets and liabilities. Nor, for that matter, did anyone ask to see the operation of Rand's facilities even though all the parties knew where the premises were and all appear to have passed it on occasion. In early 1974, two druggists in Simpson's area, in the course of a conversation, mentioned to Simpson that it appeared that Rand Laboratories was having trouble meeting its drug orders. When Simpson could get no satisfactory information from Alford and the other general partners, he, Willis and a third investor, Dr. Matta, employed Terry Schmidt, president of Schmidt and Company, an investment counsellor, to investigate the Partnership and Trust. These suits are based on the findings reported back to them by Schmidt. In fact, in 1973, Bowdle and the other general partners had a falling out. Alford and Prokop were anxious to have a stockholders' meeting, but Bowdle, still president of Rand, delayed calling one. Further dissension occurred among Bowdle and certain directors on one side and Alford and Prokop on the other. Following a proxy fight, Alford and Prokop succeeded in putting Rish, Broome, and Buchtel on the board of directors on August 21, 1973, in place of one controlled by Bowdle. As these problems continued over management, Rand's business deteriorated. In addition, Rand lost a valuable contract it had with a large drug company. The new board cancelled Rand's lease with the Partnership and at the same time decided to file Chapter XI proceedings for Rand.

Plaintiffs rely on the following alleged misstatements or misrepresentations of fact in the prospectus as giving rise to their cause of action:

(1) that the Partnership would endeavor to sell 200 units for $1,000,000 when, in fact,

only 100 units were sold. [The prospectus provides, in relevant part: "If all of the 200 Units offered hereby are sold, the maximum proceeds from the sale of the Units available to the Partnership will be $1,000,-000.00, less costs and expenses incurred .... If only 75 Units are sold, the minimum proceeds are estimated at $350,000.00 after all expenses are deducted. In such event, only Rand's machinery and equipment acquired June 6, 1971 will be purchased with such amount. If 75 Units are not sold, all commitments, less costs and expenses incurred ... will be returned to the subscribers."]

(2) that Rand owned the land and building constituting the plant and pharmaceutical manufacturing facility in Metairie, which, in fact, it leased on a month-to-month basis. [The prospectus does state that "[i]f funds are available the partnership may purchase Rand's existing land and building, located at 4936 Veterans Memorial Boulevard, Metairie, Louisiana," which does imply that Rand owned them at that time.]

(3) that the prospectus represented that the Partnership contributions would be placed in escrow at the defendant Bank, subject to withdrawal only under the conditions specified in the articles of Partnership, and that a reserve fund would be maintained in the amount of at least five percent of the total sums contributed. They complain that when Willis purchased his Partnership unit for $5,000, on December 31, 1972, that the reserve fund was below this stated minimum. [This situation was described in Financial Statements presented by certified public accountants pursuant to their audit of the Partnership, as follows: "In this instance the reserve fund balance at December 31, 1972 should be $25,750.00. At December 31, 1972, the partnership cash balance was $8,368.22 short in meeting this reserve requirement; however, during January 1973, accounts receivable in the amount of $20,000.00 were deposited and this reserve shortage was amply provided for. We have recommended to management to segregate this fund." Plaintiff's Exhibit, p. 5.]

Plaintiffs rely on the following alleged omissions of fact in the Partnership prospectus to prove their cause of action:

(1) that the "certain" used machinery and equipment to be acquired from Rand for $350,000 was the very same machinery and equipment that Rand had purchased from Century for the same amount a year earlier. They assert that the price was artificially set and inflated and not the result of arms' length negotiations between the Partnership and Rand. As proof they point to a current appraisal which fixed replacement value at $320,115 used and $460,000 new. [We think that the prospectus did not only state that the Partnership was purchasing the same equipment which Rand had purchased a year earlier from Century but also for the same amount of $350,000 which Rand had paid for it.]

(2) that Alford, Prokop and Bowdle had not only warranted Rand's payment to Century as noted in the prospectus, but had also signed an agreement to become guarantors of Century's $450,000 debt to any lender. [It should be noted that there is no proof that one transaction had anything to do with the other. Moreover, when the loan was made by First Guaranty Bank to Century, there was nothing unsound about it. It was backed by common stock as collateral and the signatures of the majority of the board of directors of Century who collectively had a five to ten million dollar net worth. The loan was timely repaid.]

(3) that the equipment to be purchased by the Partnership from Rand was of a single purpose nature, and would have no value other than in the manufacture of pharmaceuticals. [The prospectus indicated that Rand was a manufacturer of pharmaceuticals for sale to the pharmaceutical markets by itself and others. It also stated that the business of the Partnership would be to lease machinery and equipment to a company for use in the production of drugs, pharmaceuticals and chemicals. The natural conclusion to be drawn is that the machinery is for the purpose of manufacturing pharmaceuticals.]

(4) that no disclosure was made of Rand's financial condition. [The prospectus stated that the Partnership's principal business would be to purchase machinery and equipment, etc., for the purpose of leasing the same or selling it to a company engaged in the production of drugs, pharmaceuticals, chemicals, or other items. It then pointed out that Rand, the prospective lessee, had only been operating as a pharmaceutical manufacturer for less than a year and that there was no assurance as to its financial success in the highly competitive drug industry. When the prospectus did refer to a financial report it was in reference to a financial report of the Partnership which obviously was the nature of the investment described by the prospectus, not an investment in Rand Laboratories.]

Plaintiffs rely on quite a few more itemized omissions. However, the Court finds that some are duplicative and others have been deemed argumentative. E.g., it is asserted that the prospectus omitted the "fact" that other than the initial $350,000 sale and lease-back on the equipment and the subsequent $100,000 transaction on the patent rights, it was unlikely that Rand would have any other assets of a nature and value fit for purchase and lease-back by the Partnership. We find this argumentative in that the prospectus did not limit itself to dealings with Rand Laboratories, and furthermore this state of affairs could not have been known at the time of the offer.]

Plaintiffs also rely on certain alleged affirmative misstatements and omissions of fact in addition to those contained in the prospectus:

(1) that Alford and Broome indicated to Simpson that Rand had valuable patent rights and was engaged in important research and that all of these projects were portrayed as actually or ultimately commercially feasible.

(2) that Rand only needed operating capital to complete its research and development so that the processes could be applied and sold or the products produced and marketed.

(3) that the promoters painted Rand as a "good company" having a substantial research and development potential and very valuable patent rights, as previously described. [Numbers 1, 2 and 3 are statements of opinion and there was no evidence that the speakers did not believe that what they were saying was true at the time it was said.]

(4) that in offering and selling the Trust interest, the trustees (Alford, Burris and Buchtel) omitted to correct the same omissions and misstatements of fact found in the Partnership prospectus. [The Court finds that neither Burris nor Buchtel were involved in interesting either plaintiff in investing in the Trust in the first place. Dr. Buchtel, himself, lost as much money by way of the Trust as either of the plaintiffs. Additionally, neither Burris nor Buchtel should incur liability from the fact that they lent their name to the position of trustee. First of all, commitments to invest were obtained before the Trust was finalized and, second, both men considered their position as that of a signatory only. Buchtel reluctantly agreed to add his name purely as a favor to Alford and Burris did so as a business accommodation. Both were assured that they had no functions to perform and neither, in fact, performed any function as trustee.]

(5) that Alford represented to plaintiffs that investment in the Trust was sound and that investment in the Trust was for the purpose of raising $250,000 of operating capital, primarily to put to work Rand's valuable patents and its processes. [As with the first three, this also appears to be an opinion which was held by Alford at the time, witnessed in part by the fact that he also invested.]

Other alleged misstatements which have not been specifically referred to by the Court have been omitted because the Court finds that the evidence is in conflict as to whether they were actually made to the plaintiffs. In fact, the Court is not convinced that these statements were made in the manner plaintiffs remembered at trial. One which is rejected, for example, is that Alford told the plaintiffs that arrange-

ments had been made at the Bank for Trust investors to obtain unsecured loans for the full $25,500 purchase price. On the other hand, the Court finds that the majority of the investors in the trust (including Buchtel), and in the Partnership, did not borrow from First Guaranty Bank and that there was no overall scheme whereby the Bank would be the lending institution for these investments.]