FEDERAL INSURANCE COMPANY, Plaintiff,

v.

Joseph MALLARDI, Arthur Capozzi, Jr., and Craig Hoekenga, Defendants.

Joseph MALLARDI, Arthur Capozzi, Jr. and Craig Hoekenga, Third–Party Plaintiffs,

v.

PAINE WEBBER, INC., David Lincoln and Mid–Continent Associates Limited Partnership, Third–Party Defendants.

No. 86 Civ. 8774 (WK).

United States District Court, S.D. New York.

July 28, 1988.

Edward J. Daus, Kostelanetz Ritholtz Tigue & Fink, New York City, for third party plaintiffs.

John F.X. Peloso, Morgan, Lewis & Bockius, New York City, for third party defendants.

Janet Neustaetter, Schulte Roth & Zabel, New York City, for plaintiff.

## MEMORANDUM AND ORDER

WHITMAN KNAPP, District Judge.

This action arises from defendants' purchase of one and one-half units of Mid–Continent Associates Limited Partnership ("Mid–Continent" or the "Partnership"), a real estate tax shelter investment. In connection with that purchase, defendants signed promissory notes obligating them to make yearly installment payments toward the full purchase price of their units. Contemporaneously, plaintiff Federal Insurance Company signed an Investor Bond which provided that if defendants defaulted on any of their installment payments, plaintiff would be obligated to pay the amount of the defaulted installment to Citibank and to place into escrow the total principal amount then owed by the defendants for their partnership interests. Defendants in turn signed an Indemnity and Security Agreement, whereby they agreed to pay to plaintiff, upon demand, all amounts paid by plaintiff under the Investor Bond. Defendants subsequently defaulted on their obligations by failing to make the installment payment due on January 15, 1986, whereupon plaintiff paid to Citibank $54,000 (the amount of the defaulted installment) and placed the total principal amount of defendants' remaining obligation under the notes ($150,228) in an escrow account as required by the Investor Bond. Plaintiff now moves for summary judgment to recover the amounts paid out under the Bond.

In the third party action, defendants/third-party plaintiffs assert securities fraud, RICO and common law fraud and misrepresentation claims against the Partnership as well as the investment's sponsor, Paine Webber, Inc., and David Lincoln, the Paine Webber employee who sold the units to third-party plaintiffs. Third-party defendants move to dismiss the First Amended Third Party Complaint for failure to state a claim and on the ground that many of the claims are subject to arbitra-

tion. Third-party defendants also move to stay litigation of any claims that are not dismissed pending arbitration.

For reasons which follow, we deny plaintiff's motion for summary judgment. The third-party defendants' motion to dismiss is granted in part. The motion for a stay is granted in part.

We begin by discussing the third party action, since the allegations contained therein are also relevant to plaintiff's motion for summary judgment.

## MOTION TO DISMISS THIRD PARTY ACTION

### Pleaded Facts [1]

During the last week of July 1984, third-party defendant David Lincoln proposed to third-party plaintiffs that they purchase limited partnership interests, or units, in Mid–Continent. In connection with that purchase, Lincoln made the following false representations (Am.T.P.Comp. ¶ 8):

a. that the limited partnership was an "excellent investment" which had been thoroughly analyzed and researched by Paine Webber's research facilities;

b. that he was an "expert" in tax shelters and had been offered a promotion to head up the tax shelter group at Paine Webber;

c. that each of the third-party plaintiffs would be able to utilize the tax benefits allegedly offered by the limited partnership;

d. that each of the third-party plaintiffs, separately and independently, would purchase a one-half unit in the limited partnership;

e. that each of the third-party plaintiffs would be able to sell his respective one-half unit in the limited partnership whenever he so desired, without the consent of the other third-party plaintiffs;

f. that the limited partnership interests were very liquid in that there was a ready secondary market for the units;

---

1. As the heading implies, we here set forth the facts as alleged in the First Amended Third Party Complaint without, of course, expressing any view as to the merits of the allegations.

g. that each of the third-party plaintiffs could sell their respective interests within a month;

h. that the obligation of each of the third-party plaintiffs to make payments on their respective one-half units would be independent of the others', *i.e.*, their liability would be several, rather than joint and several;

i. that time was of the essence in making their investment decisions because the units were selling quickly.

In reality, however, the investments were unsuitable for individuals in third-party plaintiffs' financial situation; Lincoln was not qualified to render investment and tax advice; the tax benefits were not as represented because third-party plaintiffs could not utilize the tax write-offs or deductions to offset their taxable income; the units could not be transferred, assigned or sold without the consent of all three third-party plaintiffs; there was not a ready secondary market for the units; and the units were issued as one and one-half units in joint ownership, rather than separate and independent one-half units as represented by Lincoln.

Lincoln had access to and was familiar with Paine Webber's research concerning the investment, and possessed or had access to Mid–Continent's prospectus, which contradicted the representations made by him. In order to make the investment appear suitable although in fact it was not, Lincoln completed a Confidential Purchaser Questionnaire for the third-party plaintiffs which vastly inflated their assets. In addition, Lincoln never furnished the third-party plaintiffs with a private placement memorandum, prospectus, offering plan, tax opinion, or any other document setting forth the precise terms and conditions of their investment.

Third-party plaintiffs signed various documents pertaining to the Mid–Continent investment in July and August 1984. However, Lincoln presented third-party plaintiffs only with the signature pages, and did not give them any of the documents to read. Some of the signatures are claimed to be forged.

With respect to the documents that are the subject of plaintiff's claim, third-party plaintiffs were never advised that a bonding company would act as surety with respect to their payments, or that the agreement with the bonding company contained a provision waiving all defenses relating to improprieties inducing their purchase of the units.

In December 1984, third-party plaintiffs Capozzi and Mallardi asked Lincoln to sell each of their one-half units. Lincoln replied that it was too late to 'avoid making the installment payment due January 15, 1985, but stated that he would soon thereafter sell their units and recoup the payment. In January 1985, Mallardi telephoned Lincoln to inquire about the sale of his half-unit. Lincoln responded that he would take care of it. In February, Capozzi called Lincoln with a similar inquiry and was assured that the sale was imminent. In March 1985, Lincoln told Capozzi and Mallardi that if a sale occurred, it would be for far less than originally represented. In fact, the price of $20,000 which Lincoln originally represented he could obtain had diminished to zero. Finally in late October or early November, Lincoln claimed to have a purchaser for the units, but only upon an additional payment of $3,500 each from Mallardi and Capozzi. Finally, "in or about November 1985, Lincoln and Paine Webber informed the third-party plaintiffs by mail that if they still wished to sell their units they would have to execute additional documents ... which would in essence separate each of their one-half unit interests in the limited partnerships and pay additional 'processing' fees." (Am.T.P.Comp. ¶ 18).

Third-party plaintiffs allege that Lincoln's false representations concerning the separate ownership of the units, the liquidity of the units and the viability of a secondary market for resale proximately caused the loss of their investment. Furthermore, they aver that they purchased their interests in reliance upon Lincoln's false statement that the liability for payment on the units was separate rather than joint, and that the joint liability resulted in a claim by plaintiff against third-party plaintiff Hoek-

enga for the 1986 installment due from Capozzi and Mallardi.

## Discussion

### A. Arbitration

█ At the outset, third-party defendants contend that all of the claims asserted in the First Amended Third Party Complaint[2] are subject to arbitration. With respect to Hoekenga, we ruled at oral argument that he is entitled to a jury trial on his claim of forgery of the agreement containing the arbitration clause. Mallardi and Capozzi concede that their RICO and state law claims are arbitrable. However, the arbitration clause contained in the agreements they signed with Paine Webber specifically excludes federal securities claims. The arbitration clause reads in pertinent part:

> Any controversy between us arising out of or relating to this contract, breach thereof, or any account(s) maintained with you (*except any claim for relief by a public customer for which a remedy may exist pursuant to an expressed or implied right of action under the federal securities laws*) shall be settled by arbitration. (emphasis supplied)

Notwithstanding the unambiguous language of the arbitration clause, third party defendants argue that Capozzi and Mallardi should be required to arbitrate their federal securities claims because the emphasized language was inserted in order to comply with SEC Rule 15c2–2, 17 C.F.R. § 240.15c2–2,[3] which has since been rescinded.[4] Third-party defendants contend that the language inserted in the arbitration clause pursuant to Rule 15c2–2 is merely notice to the customer of the federal law existing at the time the agreement was executed, and does not act substantively to prevent arbitration of securities claims. The Second Circuit has not addressed this question, although it has been the subject of several lower court opinions, resulting in conflicting rulings. We reject the argument for substantially the reasons stated in *Brick v. J.C. Bradford & Co., Inc.* (D.D.C.1987) 677 F.Supp. 1251, 1255–56.

Under New York law, "a contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language employed." *Brick, supra,* 677 F.Supp. at 1256, *quoting, Morlee Sales Corp. v. Manufacturers Trust Co.* (1961) 9 N.Y.2d 16, 19, 210 N.Y.S.2d 516, 518, 172 N.E.2d 280, 281. The arbitration clause before us unequivocally excludes federal securities claims from arbitration. As the *Brick* court concluded (at 1256):

> [*Shearson/American Express, Inc. v.*] *McMahon* [482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185] does not require that section 10(b) claims be arbitrated; it merely permits arbitration if the parties have otherwise agreed to arbitration of such claims ... [T]he parties in this case have not so agreed.

The cases cited by third-party defendants which ordered arbitration notwithstanding "Rule 15c2–2 language" are distinguishable because in each case the language of the arbitration clause either did not exclude federal securities claims or was held to be ambiguous. For example, in *Frankel v. Shearson Lehman Bros.* (D.N.J. October 30, 1987) Civil Action No. 86–2520 [available on WESTLAW, 1987 WL 39934], the court found that the arbitration clause contained an ambiguity: the agreement excluded from arbitration "any controversy with a public customer for which a remedy may exist pursuant to an express or implied right of action under *certain* of

---

**2.** For the sake of simplicity, we shall use the generic term "complaint" throughout this discussion to refer to the First Amended Third Party Complaint.

**3.** That Rule stated:
> It shall be a fraudulent, manipulative or deceptive act or practice for a broker or dealer to enter into an agreement with any public customer which purports to bind the customer to the arbitration of future disputes between them arising under the Federal securities laws, or to have in effect such an agreement, pursuant to which it effects transactions with or for a customer.

**4.** The history of Rule 15c2–2 is aptly summarized in *Villa Garcia v. Merrill Lynch, Pierce, Fenner and Smith Inc.* (5th Cir.1987) 833 F.2d 545, 547, and need not be rehearsed here.

the federal securities laws" (emphasis supplied), but did not identify which "certain" federal securities laws were to be excluded. By contrast, the arbitration clause in the case at bar unequivocally excludes all federal securities claims from arbitration, not simply "certain" claims. In other cases relied upon by third-party defendants, the arbitration provision did not exclude federal securities claims from arbitration. *De Kuyper v. A.G. Edwards & Sons, Inc.* (D.Conn.1987) 695 F.Supp. 1367; *McCowan v. Dean Witter Reynolds, Inc.* (S.D.N.Y. 1987) 682 F.Supp. 741; *Finkle and Ross v. A.G. Becker Paribas, Inc.* (S.D.N.Y.1985) 622 F.Supp. 1505. Only one of the cases cited by third-party defendants contained an arbitration provision identical to the one at bar, *Sease v. PaineWebber, Inc.* (S.D. Fla.1988) 697 F.Supp. 1190, and we decline to adopt its reasoning.

## B. Section 12(2) Claim

The one-year statute of limitations is a substantive requirement of a § 12(2) claim, and failure to plead compliance mandates dismissal. *Leone v. Advest, Inc.* (S.D.N.Y. 1985) 624 F.Supp. 297, 303–04. The instant complaint was filed on November 24, 1986. It is alleged in ¶ 18 of the complaint that third-party plaintiffs became aware of the alleged fraud "in or about November 1985" when they received a letter informing them in essence that their half-units were jointly owned and that additional paperwork would be required to separate their interests. Obviously, if this letter was received prior to November 24, 1985, the claim would be time barred. Accordingly, the § 12(2) claim is dismissed, with leave to replead the precise date on which the letter was received.

## C. Section 17 Claims

■ We decline third-party plaintiffs' invitation to reconsider our ruling in *Kaufman v. Amtax Planning Corp.* (S.D.N.Y. 1986) 669 F.Supp. 573, 576. We there held that no implied private right of action exists under § 17. That claim is therefore dismissed.

## D. Section 10(b) Claims

In order to state a claim under Section 10(b), third-party plaintiffs must allege that

> in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's actions caused him injury.

*Bloor v. Carro, Spanbock, Londin, Rodman & Fass* (2d Cir.1985) 754 F.2d 57, 61. Section 10(b) claims are also subject to the strictures of Fed.R.Civ.P. 9(b), which requires that the circumstances constituting fraud be stated with particularity. Third-party defendants challenge the pleading of each of these elements except reliance.

### 1. Actionable misrepresentations

■ Initially, third-party defendants contend that the complaint fails to comply with Rule 9(b) in that it does not specify "the speaker, time, place and content of each alleged misrepresentation." *Luce v. Edelstein* (2d Cir.1986) 802 F.2d 49, 54. It is alleged that Lincoln made the statements "[i]n or about the last week of July 1984 ... to each of the third-party plaintiffs, both in person at his office and through telephonic communications with third-party plaintiffs at their homes and offices." (Am.T.P.Comp. ¶ 8). We find this sufficient.

Next, third-party defendants attack many of the asserted misrepresentations as non-actionable. However, third-party plaintiffs point out in their brief that some of those statements are included in the pleading primarily in an attempt to satisfy the statute of limitations under § 12(2) and the continuity requirement of RICO, or for the more general purpose of demonstrating the context in which the actionable misrepresentations were made. The brief identifies four statements allegedly made by Lincoln which constitute the gravamen of third-party plaintiffs' claims: first, that he was an expert in tax shelters and had been offered a promotion to head the tax shelter group at Paine Webber; second, that their investments would yield tax benefits;

third, that each of them would purchase one-half unit separately and independently; and fourth, that the units were liquid and there was a ready secondary market for them.[5]

█ Of these four statements, there is dispute only as to the first. Third-party defendants contend that Lincoln's statement that he was an expert is nothing more than "salesman's puffery," and in any event is merely a statement of opinion. However, Lincoln's claim as to his expertise is not the sort of "puffery" found non-actionable in *Frota v. Prudential–Bache Securities, Inc.* (S.D.N.Y.1986) 639 F.Supp. 1186, 1190 (broker assured plaintiffs that their account would be "properly and prudently managed" and stated that he was not only plaintiffs' broker, but their "friend, confidant and financial advisor"), *Rotstein v. Reynolds & Co.* (N.D.Ill.1973) 359 F.Supp. 109, 113 (broker told plaintiff that stock was "red hot" and "would make a bundle of money") or *Bowman v. Hartig* (S.D.N.Y.1971) 334 F.Supp. 1323, 1328 (broker stated that his primary purpose was to make profits for the customer). A broker's misrepresentation of his status is actionable where, as here, it goes to the investment's quality, i.e. where the plaintiffs' investment decision was based on the broker's recommendations, which the clients would not have accepted had they known the true nature of the broker's expertise. *Manufacturers Hanover Trust Co. v. Drysdale Securities Corp.* (2d Cir.1986) 801 F.2d 13, 21–22; *Marbury Management, Inc. v. Kohn* (2d Cir.) 629 F.2d 705, *cert. denied* (1980) 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (trainee's misrepresentation that he was a stockbroker and "portfolio management specialist" actionable when it induced plaintiffs to purchase specific securities that the trainee recommended).

█ However, in our view, the complaint at bar suffers from a more fundamental defect. Nowhere does the complaint specify how or why each of these misrepresenta-

tions is claimed to be false. As to the first representation, it is obvious that Lincoln was aware of his own position and expertise, so that no further allegations concerning falsity are necessary. The same cannot be said of the remaining misrepresentations. The complaint alleges only that Lincoln possessed or had access to Mid–Continent's offering memoranda as well as Paine Webber's research concerning the partnership, which allegedly contradicted his representations. We think that third-party defendants are entitled to be told precisely what portions of the offering memoranda or research are referred to, and how those documents demonstrate the falsity of Lincoln's statements. However, at the present time, third-party plaintiffs are not in a position to provide specific references to the prospectus or Paine Webber reports because, as they allege, Lincoln never furnished them with the documents. Once discovery commences and third-party defendants produce the documents, the specific portions which third-party plaintiffs claim contradicted Lincoln's representations can be identified through the use of interrogatories. In the event that third-party plaintiffs fail to do so, an appropriate motion may be made at that time.

### 2. Scienter

█ Although knowledge or scienter may be averred generally, the complaint must specify which events are asserted to give rise to an inference that defendants had knowledge of the falsity of the charged misstatements or acted recklessly in making such statements. *Connecticut National Bank v. Fluor* (2d Cir.1987) 808 F.2d 957, 962; *Ross v. A.H. Robbins Co.* (2d Cir.1979) 607 F.2d 545, 558, *cert. denied* (1980) 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802. One method for establishing scienter is to allege facts showing a motive for committing fraud and a clear opportunity for doing so. *Beck v. Manufacturers Hanover Trust Co.* (2d Cir.1987) 820 F.2d 46, 50. Another option is to identify cir-

---

**5.** Third-party defendants do not dispute that these four statements, assuming they were made, would be material, i.e., a reasonable in-

vestor would consider them important in deciding whether or not to purchase the partnership units.

cumstances indicating conscious behavior by the defendant. *Id.* Here, third-party plaintiffs rely upon motive plus conscious behavior.

If we were to evaluate each of the four claimed misrepresentations in a vacuum, we would have to agree with third-party defendants that the complaint does not sufficiently allege facts from which it could be inferred that Lincoln knew that any particular one of them was false. However, viewing the transaction as a whole, we think scienter is adequately alleged. The commissions to be earned from the sale of the units plainly constitute a motive for the asserted fraud. In addition, third-party plaintiffs have specifically alleged several suspicious circumstances indicating conscious behavior, including 1) Lincoln's presentation of blank signature pages to third-party plaintiffs, 2) forged signatures on some of the forms which were necessary to the transaction [6], 3) Lincoln's filing of a Confidential Purchaser Questionnaire which vastly inflated third-party plaintiffs' assets. It can be inferred from these facts that at least one of the charged statements was false.

### 3. Causation

■ Causation has two components: loss causation and transaction causation. Third-party plaintiffs must allege that the representations or omissions caused them to purchase the Mid–Continent limited partnership units, and that those asserted violations caused the claimed economic harm. *Bennett v. United States Trust Co.* (2d Cir.1985) 770 F.2d 308, 313, *cert. denied* (1986) 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776. The complaint undoubtedly alleges with specificity that third-party plaintiffs would not have bought the units had they known that Lincoln was not the expert he claimed to be and that the investment did not have the qualities represented to them. When we turn to the question of loss causation, however, the nexus between the alleged misstatements and the asserted

loss is unclear. As far as we have been able to discern, the only loss which is directly connected to a specific representation is the allegation in ¶ 17 to the effect that Lincoln induced third-party plaintiffs to purchase their units by falsely representing that their liability for payment on the units was separate rather than joint, and that the joint liability resulted in a claim by plaintiff Federal Insurance Company against Hoekenga for the 1986 installment due from Capozzi and Mallardi. The only other explanation for third-party plaintiffs' loss is found in the same paragraph, where it is alleged that by March 1985 "the selling price which Lincoln originally represented he could obtain for each of the one-half units ($20,000) had diminished to zero." This latter allegation suggests that the loss was due to Lincoln's failure promptly to sell the units, rather than to any misrepresentation which he made at the time of purchase.

The missing link is articulated in third-party plaintiffs' memorandum in opposition to the motion to dismiss. According to the brief (at 18), third-party plaintiffs' theory is that because the qualities of the investment were not as Lincoln had represented, the units lacked cash value at the time of purchase and did not confer favorable tax consequences at the time of purchase. If third-party plaintiffs elect to file a second amended third-party complaint, they are instructed to remedy the noted defect by alleging in the pleading the theory espoused in their brief. Should they elect not to file another amended pleading, we shall deem this one amended to conform to the contentions made in their brief.

In summary, the motion to dismiss the third claim for relief is denied.

### MOTION FOR STAY OF PROCEEDINGS

■ Having concluded that the First Amended Third Party Complaint adequately pleads a claim under § 10(b), we next

---

**6.** As we observed at oral argument, one does not have to be a handwriting expert to see that Hoekenga's purported signatures on two of the documents submitted to us are not the same.

*Compare* Ex. B to Notice of Motion for Summary Judgment in Lieu of Complaint *with* Ex. C to Knight Aff.

address third-party defendants' motion to stay litigation of that claim pending the arbitration proceedings covering Capozzi's and Mallardi's state law and RICO claims. Third-party defendants rely upon *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.* (2d Cir. 1987) 815 F.2d 840, 856, which held that a stay is appropriate "if the arbitrable claims predominate the lawsuit and the nonarbitrable claims are of questionable merit." We cannot say that that description applies to the complaint at bar. We follow the rule announced in *Chang v. Lin* (2d Cir.1987) 824 F.2d 219, 223 that "arbitration and federal litigation should proceed simultaneously absent compelling reasons to stay the litigation." As third-party defendants have presented no compelling reason to defer litigation of the § 10(b) claim, the motion for a stay of that claim is denied.

## MOTION FOR SUMMARY JUDGMENT ON MAIN ACTION [7]

■ Section 2(b) of the Indemnity and Security Agreement signed by each defendant provides in pertinent part:

> The Obligations of the Indemnitor hereunder are absolute and unconditional and will be paid or performed strictly in accordance with the terms hereof irrespective of (i) any lack of validity or enforceability of, or any amendment or other modifications of, or waiver with respect to, the Bond, the Note, the Subscription Agreement, this Agreement, the Partnership Agreement or any other Limited Partner's Note or Subscription Agreement, or Indemnity and Security Agreement or any agreement between the Partnership and the Bank or any other instrument or agreement relating to any thereof; ... (vi) any other circumstance which might otherwise constitute a defense available to, or discharge of, the Indemnitor in respect of the Note or the Obligations (as hereinafter defined).

Plaintiff's summary judgment motion raises the question of whether or not defendants, by virtue of the above-quoted provision, waived their right to assert as a defense to plaintiff's suit on the Indemnity and Security Agreement that they were fraudulently induced to buy their interests in Mid–Continent.

Defendants rely upon *Citibank., N.A. v. Plapinger* (1985) 66 N.Y.2d 90, 92, 495 N.Y.S.2d 309, 309, 485 N.E.2d 974, 974, in which the New York Court of Appeals held that "[f]raud in the inducement of a guarantee by corporate officers of the corporation's indebtedness is not a defense to an action on the guarantee when the guarantee recites that it is absolute and unconditional irrespective of any lack of validity or enforceability of the guarantee, or any other circumstance which might otherwise constitute a defense available to a guarantor in respect of the guarantee." The court distinguished between general merger clauses (which were found ineffective to exclude parol evidence of fraud in the inducement) and specific disclaimers (which were held to bar the defense of fraudulent inducement). Certainly the language of ¶ 2(b) falls into the latter category.

*Plapinger* was based upon an earlier line of cases, such as *Danann Realty Corp v. Harris* (1959) 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597, which held that the general rule that fraud in the inducement vitiates a contract is subject to exception where the party claiming to have been defrauded has specifically disclaimed reliance upon the misrepresentations comprising the alleged fraud. The rationale of those earlier cases is captured by the following observation from Judge Burke's opinion in *Danann Realty,* 5 N.Y.2d at 323, 184 N.Y. S.2d at 604, 157 N.E.2d at 600, a portion of which was cited by the *Plapinger* court (66 N.Y.2d at 94, 495 N.Y.S.2d at 311, 485 N.E.2d at 976):

> [T]he plaintiff made a representation in the contract that it was not relying on specific representations not embodied in

**7.** Plaintiff originally brought this action in New York State Supreme Court as a motion for summary judgment in lieu of complaint under CPLR § 3213. Defendants removed the action to this court. The question of whether or not the instant Complaint satisfies the requirements of § 3213 is discussed at length in the briefs. However, we need not address it, as the motion is also brought under Rule 56 of the Federal Rules of Civil Procedure.

the contract, while, it now asserts, it was in fact relying on such oral representations. Plaintiff admits then that it is guilty of deliberately misrepresenting to the seller its true intention. To condone this fraud would place the purchaser in a favored position.

The *Plapinger* court went on to observe that the *Danann Realty* rule concerning specific disclaimers had been criticized by commentators on the ground that a distinction should be drawn between negotiated agreements and standard form clauses. 66 N.Y.2d at 95, 495 N.Y.S.2d at 311, 485 N.E.2d at 976. Since the clauses in both *Plapinger* and *Danann Realty* had been negotiated at arms length, the court left open the question of whether the same rule would apply to standard form agreements such as the one here in dispute.[8] It seems to us that a sound basis exists for distinguishing between the two types of contracts, in that the *Danann Realty* rationale would seem inapplicable in the situation where, as here, defendants allege that there was no discussion or negotiation of the Indemnity and Security Agreement and indeed contend that they were not even aware of the existence of such agreement because they were provided only with blank signature pages. In these circumstances, we would be hard pressed to find that defendants were "guilty of deliberately misrepresenting ... [their] true intention." However, we need not resolve the question left open in *Plapinger* because there remain factual issues which defendants are entitled to explore in discovery.

■ It is elementary that fraud in the inducement may not be used as a defense against a plaintiff unless plaintiff participated in the fraud. *G. & S. Foods, Inc. v. Vavaroutsos* (N.D.Ill.1977) 438 F.Supp. 122, 125 (party could not rely on misrepresentations made to it by third-party to avoid obligations under promissory note when holder of note did not have knowl-

edge of or participate in fraud); *United States v. Basil's Family Supermarket, Inc.* (S.D.N.Y.1966) 259 F.Supp. 139, 141 and cases cited. Plaintiff contends that the allegations of fraud which are the subject of the third-party action are irrelevant to its action upon the Indemnity and Security Agreement because there is no allegation that plaintiff made any misrepresentations or otherwise took part in the fraud. Defendants contend that summary judgment is premature since no discovery has taken place and they have not had an opportunity to explore the relationship between plaintiff, Lincoln and Paine Webber. We agree with defendants. If they can establish that plaintiff used Lincoln as its agent, and thereby is chargeable with having participated in his alleged fraud upon defendants, the defense of fraudulent inducement should be available against plaintiff. Should such participation be established, we shall then be called upon to address the above discussed question which was left open in *Plapinger*. We do not try now to resolve that question because we think a sounder resolution could be reached on the basis of a fuller understanding of the relationship between the parties.

Accordingly, plaintiff's motion for summary judgment is denied.[9]

## CONCLUSION

Plaintiff's motion for summary judgment is denied. Third-party defendants' motion is resolved as follows: a) the motion to compel arbitration of third-party plaintiff Hoekenga's claims is denied, and the matter is set down for trial on the issue of whether his signature on the arbitration agreement was forged; b) as to Mallardi and Capozzi, the motion to dismiss is granted with respect to the first and second claims (with leave to replead as to the § 12(2) claim only) and denied with respect to the third claim; c) the motion to compel arbitration of Capozzi's and Mallardi's re-

---

8. Our research has uncovered no subsequent decisions addressing the question left open in *Plapinger*.

9. Plaintiff's summary judgment motion was styled. as a motion to sever and for summary judgment. At oral argument, plaintiff conceded that there would be no sense in severing its claim if its motion for summary judgment were to be denied. Accordingly, we deny the motion to sever.

maining claims is granted, and those claims are stayed pending arbitration. Third-party defendants' motion to stay litigation of Mallardi's and Capozzi's third claim pending arbitration is denied.

SO ORDERED.