Dr. Windsor **DENNIS,**
Plaintiff–Appellant,

v.

**GENERAL IMAGING, INC.,** Defendant,

**New South Distributors, Inc., et al.,**
Defendants–Appellees.

No. 90–3052.

United States Court of Appeals,
Fifth Circuit.

Dec. 3, 1990.

Bruce A. North, Celeste Brustowicz, K. Margaret Le, Malony, North & Hanewinekel, Metiaire, La., for plaintiff-appellant.

Leroy A. Hartley and Robert C. Wallace, New Orleans, La., for Copelin, Villavso, New South Distributors.

M. Arnaud Pilié, Pilié, Pilié and Landry, New Orleans, La., for Thomas.

James L. Wheeler, Wheeler & Assoc., Metairie, La., for Campo.

Norbert A. Simmons and Ivy J. Prout, New Orleans, for Carl D. Robinson.

Before POLITZ, WILLIAMS, SMITH, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Dr. Windsor Dennis sued Sherman Copelin, Lloyd Villavaso, Dr. Carl Robinson, and Dr. Ignatius Thomas for alleged violations of sections 12(1), 12(2), and 15 of the Securities Act of 1933 and sections 10(b) and 20 of the Securities Exchange Act of 1934. In addition, he alleged that Copelin and Villavaso violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*[1] The district court granted summary judgments to Villavaso, Copelin, Thomas, and Robinson. Dennis appeals. We conclude that the district court properly awarded summary judgments. We affirm the decision of the district court based upon Judge Arceneaux's lucid and thorough opinion. Summary judgments were granted only upon the federal claims. Three pendent state claims were properly dismissed without prejudice. Finally, we have no need to consider the validity of the district court's holding that intrastate telephone calls satisfy the jurisdictional requirement of a claim under Section 12(1) of the Securities Act of 1933. The opinion of the district court is appended.

## I.

We cannot affirm the summary judgments unless "we are convinced, after an independent review of the record, that 'there is no genuine issue as to any material fact' and that the movant is 'entitled to a judgment as a matter of law.'" *Brooks, Tarlton, Gilbert, Douglas & Kressler v. United States Fire Ins. Co.,* 832 F.2d 1358, 1364 (5th Cir.) (quoting Fed.R.Civ.P. 56(c)), *clarified on rehearing,* 832 F.2d 1378 (5th Cir.1987). After a careful review of the entire record, we conclude that no issue of material fact exists and that the four appellees are entitled to summary judgments under the law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The district court's opinion presents a complete analysis of why summary judgment is proper. We address here only three minor issues that the parties raised on appeal that are not fully answered in the district court's opinion: plaintiff's need for particularized allegations, waiver of affirmative defenses, and the interstate commerce requirement of Section 12(1) of the Securities Act of 1933.

## II.

Dennis complains that the district court placed an improper burden of production and proof on him in two aspects because it often noted his failure to make "particularized allegations." The complaint is unfounded. In the first aspect, the district court was simply noting Dennis's failure to support his allegations so that an issue of material fact remained after the defendants presented evidence countering his allegations. Unsupported assertions are insufficient, when challenged by appropriate evidence submitted on summary judgment, to create an issue of material fact. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553; *Matter of Lewisville Properties, Inc.,* 849 F.2d 946, 950 (5th Cir.1988). In the second aspect, the court acted correctly in noting Dennis's failure to comply with Fed.R.Civ.P. 9(b)'s requirement that fraud and mistake be alleged with particularity. The district court did not place upon Dennis an improper burden of production or proof.

Second, Dennis argues that the district court should not have applied the intrastate transaction exemption to thwart his claims under § 12(1) of the 1933 Act. Because the defendants did not raise this defense in their answers, Dennis contends that the defendants waived the defense under Fed.R.Civ.P. 8(c). Dennis reads Rule 8(c) too restrictively. In the absence of

---

1. Dennis also sued New South Distributors, Inc., Dr. Nicholas J. Campo, and Family Medical Care Center. These defendants did not move for summary judgment and are not before us.

unfair surprise, defendants did not waive the defense by their failure to plead it in their answers. *Allied Chem. Corp. v. Mackay*, 695 F.2d 854, 855–56 (5th Cir. 1983).[2] Dennis was not victimized by a surprise. The intrastate exemption was at issue throughout discovery and summary judgment proceedings. The defendants' failure to raise the exemption in their answers, therefore, did not constitute waiver of the defense. The district court properly considered the defense.

Third, the defendants in response to the appeal contend that the district court should not have reached the intrastate exemption issue because they had not made telephone calls in commerce so there was no jurisdiction over them. A jurisdictional requirement for § 12(1) of the 1933 Act is proof that there had been transportation, communication, or mails "in commerce" in the offer or sale of the securities. The defendants urge that Dennis could not use intrastate telephone calls to satisfy this jurisdictional requirement of § 12(1). The district court held to the contrary. In finding that the jurisdictional requirement had been met the court said: "It has long been held that intrastate telephone calls in which securities are promoted or offered satisfies the jurisdictional provisions of the securities laws." While the district court correctly decided the issue for the Securities Exchange Act of 1934, the issue is still open under § 12(1) of the 1933 Act.

██ The two cases the district court cited as authority address the jurisdictional requirements of the 1934 Act. *Loveridge v. Dreagoux*, 678 F.2d 870, 874 (10th Cir. 1982); *Dupuy v. Dupuy*, 511 F.2d 641, 642–42 (5th Cir.1975), *cert. denied*, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977).[3] Decisions on the jurisdictional requirements of the 1934 Act do not necessarily control the meaning of the jurisdictional requirements of § 12(1) of the 1933 Act. In holding that intrastate telephone calls are sufficient under the 1934 Act in *Dupuy*, we noted the differences in the jurisdictional requirements of the two acts. *Dupuy*, 511 F.2d at 642. There appears to have been no authoritative holding that intrastate telephone calls meet the "*in commerce*" requirement of § 12(1) of the 1933 Act as opposed to the "instrumentality *of* commerce" provision of the 1934 Act. In any event, since it is clear that the defendants are not liable under § 12(1), that question is not at issue in this case.

Accordingly, we AFFIRM the district court's granting of the summary judgments.

AFFIRMED.

DISTRICT COURT OPINION APPENDED.

## APPENDIX

Windsor Dennis

Versus

General Imaging, Inc.,

New South Distributors, Inc.,

Nicholas J. Campo,

Sherman Copelin,

Lloyd Villavaso,

Family Medical Care Center,

Carl Robinson and

Ignatius Thomas

Civil Action No. 87–0418

### SECTION K(1)

Before the Court are Motions for Summary Judgment by defendants Dr. Ignatius

---

**2.** *See also Perez v. United States*, 830 F.2d 54, 57 (5th Cir.1987); *Lucas v. United States*, 807 F.2d 414, 417–18 (5th Cir.1986); *Bull's Corner Restaurant, Inc. v. Director of the Fed. Emergency Management Agency*, 759 F.2d 500, 502 (5th Cir.1985).

**3.** There is no jurisdictional problem with Dennis's claim under § 12(2) of the 1933 Act. Section 12(2) covers purely intrastate transactions. *See Nor–Tex Agencies, Inc. v. Jones*, 482 F.2d 1093, 1099 (5th Cir.1973), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1563, 39 L.Ed.2d 873 (1974) (in connection with charges under § 12(2) noting that "even if the transactions were isolated intrastate contracts made pursuant to private offers, the sales of securities were still subject to the anti-fraud provisions of the federal securities acts.").

Thomas (Doc. 74) and Dr. Carl Robinson (Doc. 75) and a Motion to Dismiss And/Or Motion For Summary Judgment On Behalf of defendants Sherman Copelin and Lloyd Villavaso (Doc. 72). These motions arise out of a suit asserting violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, Sections 12(1), 12(2) and 15 of the Securities Act of 1933 and Sections 10(b) and 20 of the Securities Exchange Act of 1934 and various pendent state law claims.[1] These defendants seek dismissal of all the claims asserted against them by the plaintiff, Dr. Windsor Dennis, arising out of a series of soured investments he made from February to April 1986 in two Louisiana corporations, defendants General Imaging, Inc. ("General Imaging") and New South Distributors, Inc. ("New South").

*Facts*

The following uncontroverted material facts are gleaned from the materials and filed in this matter.

In February, 1986, Dr. Nicholas Campo and other doctors not named in this action who were officers and directors of a Louisiana corporation named Family Medical Care Centers of America ("FMCCA") solicited limited partnership participation in a series of partnerships in which FMCCA would be the general partner. The partnerships would own and establish medical clinics on the premises of Schwegmann grocery stores in the metropolitan New Orleans, Louisiana area and FMCCA was to have an exclusive contract managing each facility.

Learning of this opportunity plaintiff contacted Lloyd Villavaso, New South's accountant[2], to discuss investing in the FMCCA projects. At a meeting attended by Campo, Villavaso and defendant Sherman Copelin, plaintiff was informed that no partnership interests in the medical clinics were then available. At that time, plaintiff alleges that Campo, Villavaso and Copelin offered him an investment opportunity in New South. New South was a Louisiana corporation incorporated on August 12, 1985 to distribute liquor in Louisiana. Campo, Copelin and Robinson were its directors and defendant Dr. Ignatius Thomas was an investor in the firm.

Plaintiff's unrebutted allegation is that at this meeting Dennis was told by Campo, Copelin and Villavaso that New South had entered into a letter agreement with John Schwegmann to provide his grocery store chain with private label liquor products and was, in fact, doing so. New South planned to obtain the rights to distribute national liquor brands throughout the state. Dennis alleges, and defendants do not rebut this allegation, that Campo, Copelin and Villavaso were very optimistic about New South's prospects and touted its profit-making potential based on the Schwegmann contract and the plans to obtain licensing for national brands. On the strength of these representations, repeated by Villavaso and Copelin in subsequent conversations, Dennis bought twelve shares of New South stock for $75,000.00 with two separate checks in the amount of $37,500.00 each.

Although New South did obtain a license to distribute liquor in Louisiana, it never obtained any rights to distribute national brands. In addition, New South entered into a service contract with a corporation, wholly owned by Copelin, named Marketing Services, Inc. ("Marketing Services") to operate New South for as long as it owned a liquor distribution license for a fee of $16,-

---

1. In the pendent state law claims plaintiff alleges that defendants Campo, Copelin and Villavaso have violated the Louisiana Blue Sky Law, La.Rev.Stat.Ann. § 51:701 *et seq.* (Count VII), and that all defendants have "breach[ed] fiduciary duties" (Count VIII) and violated prohibitions against wrongful misrepresentation and negligence under La.Civ.Code Ann. arts. 1847 and 2315 respectively (Count IX).

2. In his deposition, Villavaso testified that he could compile no financial records of New South before July 1986 because Dr. Campo insisted that the firm's bank statements be sent to his home and rejected a number of requests from Villavaso to provide him with this information (Doc. 72, Exh. 19, pp. 28–29). Copelin testified in his deposition to Campo's total control of the financial affairs and information of General Imaging, as well as of New South, until July, 1986. (Id., Exh. 17, pp. 53–55)

000.00 per month. While Dennis claims he was not told of this contract before investing in this firm, his financial planner, Randolph Waesche, met with Villavaso and reviewed a New South *pro forma* financial statement, prepared by Villavaso, that reflected a liability to Marketing Services for $200,000.00 that Villavaso explained represented amounts owed that firm for services rendered.

Dennis alleges that these funds and those contributed to New South by another investor, Don Carter, a nonparty to this action who invested $100,000.00 in two $50,000.00 installments, were in large part depleted by payments to Villavaso, Marketing Services and FMCCA for purposes unrelated to New South's operations.

Shortly after being offered the New South opportunity, Villavaso invited Dennis to meet with the principals of General Imaging, a corporation incorporated in Louisiana on December 9, 1985 to manufacture an image processing machine called the EP 1000. This machine was purported to electronically transmit high resolution diagnostic images over long distances. Attending this initial meeting was Campo, a General Imaging director, Copelin and Villavaso, General Imaging investors [3], and other directors and investors not named in this action. Dennis alleges that Copelin and Villavaso showed him a copy of a contract wherein General Imaging director and Chief Executive Officer Dan Callahan had agreed to sell 150 of the EP 1000 machines to Independent Network Systems, Inc. ("Independent Network") for a total price of $1,650,000.00. He alleges that these two defendants told him that a number of firms were interested in distributing the imaging machine and that General Imaging was also producing a high quality laser printer which was receiving great interest in the marketplace.

On the basis of these representations and Campo's representations that the firm needed additional capital to complete necessary software, Dennis invested $62,500.00 to obtain a 5% interest in General Imaging. He wrote a check at that meeting for $12,500.00 and paid the remaining $50,000.00 by check dated April 11, 1986. On April 26, 1986, Dennis paid an additional $62,500.00 for another 5% interest in General Imaging for a total investment of $125,000.00. He claims that rather than being used for General Imaging's benefit, Campo diverted almost $60,000.00 of this amount for his own personal use either through withdrawals to himself or to FMCCA.

Movers contend, unrebutted by plaintiff, that Villavaso was told by a General Imaging employee, Don Colomb, some time in May or June 1986, (after plaintiff's last investment) that Callahan had abrogated the contract with Independent Network by a document dated March 17, 1986. Copelin, Villavaso, Robinson, Thomas and Dennis all claim to have been ignorant of this document until this time. Villavaso immediately notified Copelin who told Dennis of this document. Copelin and Dennis then drove to Campo's house to obtain New South's and General Imaging's financial records. After obtaining the records, Copelin delivered them to Villavaso to prepare ledger sheets reflecting the corporations' financial condition. It was at this time that the three discovered that Campo had written seven checks on General Imaging's account, either to himself or to FMCCA, totalling $59,671.63 and that he had written two checks to himself on New South's account totalling $10,012.28. Plaintiff also claims he discovered for the first time that five checks were written to Marketing Services on New South's account that totalled $60,320.02 and that Villavaso had received $16,654.41 from New South.[4]

Copelin called a New South shareholders meeting in July 1986 and assumed manage-

---

**3.** Plaintiff provides no evidence to rebut Villavaso's contention that his entire investment in General Imaging was two shares given him in lieu of the $2500.00 per month fee he was due under his contract to perform accounting services for New South.

**4.** Villavaso also received an additional $9,897.29 in payments from Marketing Services.

ment of New South. After assuming control, he also learned that New South owed the State of Louisiana unpaid liquor taxes. Supported by a $500,000.00 line of credit from Don Carter, Copelin paid the liquor taxes due and continued operating New South, delivering Schwegmann's brand liquor to Schwegmann stores. He also continued trying to obtain the rights to distribute national liquor brands. By December 30, 1987, however, when it was clear that New South could not operate profitably on the basis of the Schwegmann's contract alone and that it would not obtain national brand distribution rights, the firm entered bankruptcy.

### Analysis

#### 1. Defendants' Alternative Motions

The Court notes that defendants Copelin and Villavaso have alternatively styled their motion as one to dismiss under Federal Rule of Civil Procedure 12(b) or as one for summary judgment under Federal Rule of Civil Procedure 56 ("Rule 56"). The Court must construe the motion as one for summary judgment if it considers any material submitted other than the pleadings in resolving it, as the Court has done in the present case. This may be done so long as the opposing party has notice of the scope of the Court's analysis and has an opportunity to submit appropriate materials supporting its position. Rule 56. Because plaintiff submitted affidavits and deposition testimony in support of its opposition to the motions addressed here, he clearly anticipated that the Court might consider material other than pleadings and so the Court may consider the merits of the motions.

#### 2. Federal Securities Law Claims

Plaintiff alleges that Villavaso and Copelin[5] violated Sections 12(1) ("Section 12(1)") (Count I)[6], Sections 12(2) ("Section 12(2)") (Count II) and 15 ("Section 15") (Count III) of the Securities Act of 1933 ("1933 Act") and Sections 10(b) ("Section 10(b)") (Count IV) and 20 ("Section 20") (Count V) of the Securities Exchange Act of 1934 ("1934 Act")[7]. He also alleges that Robinson and Thomas violated Section 15 of the 1933 Act and Sections 10(b) and 20 of the 1934 Act. An analysis of the pleadings, affidavits and deposition testimony submitted shows, however, that plaintiff cannot maintain any of these claims against any of these defendants.

##### a. Section 12(1) claims

Section 12(1) of the 1933 Act, 15 U.S.C. § 77*l* (1)[8] provides a kind of strict liability upon a seller of securities for failure to register securities subject to the 1933 Act's registration requirements before selling them. *Swenson v. Engelstad*, 626 F.2d 421, 424 (5th Cir.1980); *Hill York Corp. v. American International Franchises, Inc.*, 448 F.2d 680, 686 (5th Cir. 1971). To make out a *prima facie* case of a violation of this section, plaintiff bears the burden of proving 1) an offer or sale of a security; 2) the security was not registered pursuant to Section 5 of the 1933 Act, 15 U.S.C. § 77e, and 3) the sellers used the United States mail or facilities of interstate commerce in connection with the offer or sale. *Swenson*, 626 F.2d at 425; *Doran v. Petroleum Management Corp.*,

---

**5.** Plaintiff has alleged all nine counts set forth in his amended complaint against defendant Nicholas J. Campo. Because Dr. Campo has brought no motions for the Court to consider, the Court will not discuss the allegations as they pertain to him.

**6.** All referenced counts are to plaintiff's amended complaint (Doc. 11).

**7.** Sections 12(1), 12(2) and 15 of the 1933 Act, 15 U.S.C. §§ 77*l* (1) and (2) and 77*o* respectively; Section 10(b) and 20 of the 1934 Act, 15 U.S.C. §§ 78j(b) and 78t respectively.

**8.** Section 12(1) of the 1933 Act provides:

> Any person who—
> (1) offers or sells a security in violation of 77(e) of this title . . .
> shall be liable to the person purchasing such security from him, . . . to recover the consideration paid for such security with interest thereon, . . . upon the tender of such security, or for damages if he no longer owns the security.

545 F.2d 893, 899 (5th Cir.1977), *appeal after remand*, 576 F.2d 91 (5th Cir.1978).

While plaintiff may be able to meet this burden [9], the Section 12(1) claims cannot be maintained in this suit because the General Imaging and New South securities at issue here were exempt from registration according to Section 3(a)(11) of the 1933 Act, 15 U.S.C. § 77c(a)(11),[10] as an intrastate transaction. This exemption exempts securities transactions in which the securities' issuer, all offerees and all purchasers are resident within a single state. While defendants bear the burden of proving entitlement to exemptions, *See, Securities and Exchange Commission v. Ralston Purina Co.*, [346] U.S. 119, 126, 73 S.Ct. 981, 985 [97 L.Ed. 1494] (1953); *Lawler v. Gilliam*, 569 F.2d 1283, 1291 (4th Cir.1978), they have clearly done so and there is no material fact issue presented in this regard. The defendants' affidavits and deposition testimony show that this stock was not offered or sold to anyone other than Louisiana residents and that both corporations were doing business in this state. While it is not clear which of the defendants to this action may be the statutory "issuer" or issuers of the stock, *See*, 15 U.S.C. § 77b(4), there is no evidence to support a finding that anyone who may be an issuer is not a resident of Louisiana or is not doing business in this state. Villa-

vaso, Campo, and Copelin are Louisiana residents and the incorporation documents of General Imaging and New South indicate that they are incorporated and doing business in Louisiana.

Even though defendants have not explicitly discussed the SEC guidelines set out in the Securities and Exchange Commission ("SEC") Rule 147, the Safe Harbor Rule, 17 C.F.R. § 230.147, providing guidelines for determining entitlement to the Section 3(a)(11) exemption, these guidelines are clearly met here. Defendants' unrebutted evidence indicates that all of New South's and General Imagings' earnings were derived in Louisiana, 17 C.F.R. § 230.147(c)(2)(i), that all of their assets were located in Louisiana, 17 C.F.R. § 230.147(c)(2)(ii), and that all the proceeds of the stock sales made to the plaintiff were "to be used, and [were in fact] used, ... in connection with the operation of [their] business[es] ... or the rendering of services within [Louisiana]." 17 C.F.R. § 230.147(c)(2)(iii). Because Section 12(1)'s prohibition applies only to securities subject to registration, there is no construction of these facts that would allow a factfinder to conclude that either Villavaso or Copelin violated it.

### b. Section 12(2) Claims

Section 12(2) of the 1933 Act, 15 U.S.C.

---

**9.** It is without question that stock is a security covered by the Act, Section 2(1) of the 1933 Act, 15 U.S.C. Section 77b(1); *Securities and Exchange Commission v. W.S. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100 [90 L.Ed. 1244] (1946), and that securities of New South and General Imaging were offered and sold to the plaintiff. The parties stipulate that the New South and General Imaging securities Dr. Dennis bought were not registered and by virtue of the allegations about which all parties agree that Villavaso and Copelin affirmatively encouraged plaintiff to buy this stock, there is a material dispute concerning whether these defendants are "sellers" for purposes of Section 12(1). *Pinter v. Dahl*, 486 U.S. 622, 108 S.Ct. 2063, 2077 [100 L.Ed.2d 658] (1988).

Although these defendants have challenged the third prong of the Section 12(1) test on the grounds that there is no proof that the telephone calls cited by the plaintiff were made between states or that the mails were used in connection with the offer or sales of these secu-

rities, these contentions are clearly without merit. It has long been held that intrastate telephone calls in which securities are promoted or offered satisfies the jurisdictional provisions of the securities laws. *Dupuy v. Dupuy*, 511 F.2d 641, 642–44 (5th Cir.1975), *appeal after remand*, 551 F.2d 1005 (5th Cir.1977), *reh. denied*, 554 F.2d 1065 (1977); *Loveridge v. Dreadgoux*, 678 F.2d 870, 874 (10th Cir.1982).

**10.** Section 3 of the 1933 Act provides, in pertinent part:

(a) Except as hereinafter expressly provided, the provisions of ... subchapter [77] shall not apply to any of the following classes of securities:

(11) Any security which is a part of an issue offered and sold only to persons resident within a single State or Territory, where the issuer of such security is a person resident and doing business within or, if a corporation, incorporated by and doing business within, such State or Territory.

§ 77*l* (2) [11], provides for liability of the seller of securities to the purchaser if the seller makes a material misstatement or omission of fact and "cannot sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or material omission." Unlike Section 12(1), liability can be imposed upon the seller of securities for sales of securities that are not subject to registration. The seller must be found, however, to have made misstatements or omissions and these must be material, i.e., there must be:

> a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available.

*TSC Industries, Inc. v. Northway,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132 [48 L.Ed.2d 757] (1976); *See also, Simpson v. Southeastern Investment Trust,* 697 F.2d 1257, 1258 (5th Cir.1983) (standard for materiality with regard to misstatements whether an average, prudent investor would consider the truth important in making investment decision); *Hill York Corp.,* 448 F.2d at 668.

The statute also imposes a duty of reasonable care on the seller. While the exact requirements of this duty depend on the nature of the relationship of the seller at issue to his buyer, *Sanders v. John Nuveen & Co.,* 619 F.2d 1222, 1228 (7th Cir. 1980), *cert. denied,* 450 U.S. 1005, 101 S.Ct. 1719 [68 L.Ed.2d 210] (1981), federal courts agree that a showing by the seller that he made reasonable inquiries into the possibility of fraud of the issuer and discovered nothing wrong, *id.,* or that no fraud could be discovered by the exercise of reasonable care, *Junker v. Crory,* 650 F.2d 1349 (5th Cir.1981), warrants a denial of liability.

■ As an initial matter, it is clear that neither Thomas nor Robinson can be found liable under Section 12(2) because plaintiff provides no particularized facts to support his Section 12(2) allegations against them. Federal Rule of Civil Procedure 9(b); *Roebuck v. Guttman,* 678 F.Supp. 68 (S.D.N.Y. 1988). The reason for this deficiency as to Thomas is clear. The only relationship Thomas had with New South or General Imaging was as a minority shareholder. Plaintiff does not allege, and there is no evidence from which to conclude, that he promoted, or had any other hand in the sales of, these investments to Dennis or had any control over either corporation. Robinson admits to being a New South director. Plaintiff does not allege, however, that any of the misstatements or omissions he cites in connection with this claim were made by Robinson. Because no construction of the facts of this case can lead to a finding of Section 12(2) liability against these defendants, they are entitled to judgment as to the Section 12(2) claims. *Celotex v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548 [91 L.Ed.2d 265] (1986).

■ The Section 12(2) claims cannot stand against Villavaso and Copelin because even construing the statements that plaintiff alleges were material misrepresentations or omissions most favorably for the

---

11. Section 12(2) of the 1933 Act provides:
    Any person who—
      (2) offers or sells a security (whether or not exempted by the provisions of section 77(c) of this title, other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him, ... to recover the consideration paid for such security with interest thereon, ... upon the tender of such security, or for damages if he no longer owns the security.

plaintiff, they cannot be considered misstatements. The evidence provided is uncontroverted in showing that the statements were either accurate when made to the plaintiff or his authorized representative and they were reasonably supported by evidence to which plaintiff had access, or that these defendants were as ignorant of the truth as the plaintiff at the time the representations were made. *Loan v. Federal Deposit Insurance Corporation*, 717 F.Supp. 964 (S.D.N.Y.1986).

The first misrepresentation alleged by the plaintiff was that both Villavaso and Copelin told him New South had the *potential* to sell national brands of liquor. Defendants admit that they made this representation to plaintiff because the firm had been granted a license to sell liquor in the state of Louisiana and had negotiated a favorable lease on a storage facility, a requirement to fulfilling the Schwegmann contract. In other words, the statement was true and accurate when made and so cannot be a misstatement. *Simpson*, 697 F.2d at 1259. Plaintiff testified by deposition that no defendant to this action told him that New South was in fact selling national brands or had the right to do so. Encouraging words alone are not enough to allege a securities law violation and there are no particularized allegations that Villavaso and Copelin knew that this representation was false or that it was carelessly arrived at. *See, Junker*, 650 F.2d at 1361; *Federal Insurance Company v. Mallardi*, 696 F.Supp. 875 (S.D.N.Y.1988). It cannot support a Section 12(2) violation.

The plaintiff also alleges that neither Villavaso nor Copelin told him that they and other New South and General Imaging investors—Campo, Thomas and Robinson—paid much less for their stock in New South than did the plaintiff[12]. He also alleges that no one told him that New South had a contract with Marketing Services for $16,000.00 per month.

Neither of these contentions is supported by the evidence provided. The deposition of Randolph Waesche, Dr. Dennis' accountant who advised plaintiff concerning these transactions, indicates that Waesche was told, and therefore knew, both these pieces of information. Waesche testified that he discussed the share price paid by the defendants in reviewing with Villavaso the price Dr. Dennis was to be charged for New South stock (Waesche Dep., pp. 74, 97). Waesche also discussed with Villavaso the amounts Campo paid for his interest in General Imaging (Waesche Dep., p. 67). While it does not appear that Waesche was told that Marketing Service's contract with New South called for a monthly fee, Waesche admits discussing with Villavaso the $200,000.00 amount owed to Marketing Services and the effect it might have on New South's finances (Waesche Dep. pp. 86–88). Because the plaintiff authorized Waesche to receive information on his behalf about these two potential investments and the information in question was clearly disclosed to Waesche, and since furnishing the information to Waesche was the functional equivalent of providing it to Dennis, there were no misrepresentations made as to these items of information. *TSC*, 426 U.S. at 449, 96 S.Ct. at 2134; *Wollins v. Antman*, 638 F.Supp. 989, 991 (E.D.N.Y. 1986).

The last violations alleged by plaintiff are that neither Copelin nor Villavaso told him of the addendum to General Imaging's contract with Independent Network that essentially eviscerated the latter's obligation to buy General Imaging products or about Campo's transferring funds from New South and General Imaging to FMCCA and himself.

Plaintiff does not dispute the deposition testimony of Copelin and Villavaso, however, that they did not know of any such abrogation until sometime in April to May 1986, after Dennis' last investment and, in fact, it was Copelin and Villavaso who told Dennis about this problem and about the funds transferred to Campo and FMCCA.

---

12. Dennis paid $6,250 per share for his twelve shares of New South stock. The defendants each paid $100.00 per share.

In other words, plaintiff does not dispute that until late April 1986, Villavaso and Copelin were as ignorant of the addendum's existence, and of Campo's transfer of funds from New South and General Imaging, as Dennis was so they cannot be held liable under Section 12(2) on that score. *Junker,* 650 F.2d at 1361. Defendants can only be found liable under Section 12(2) for these omissions if they were negligent in not knowing about them. Nowhere does plaintiff particularize, as required by the Court's standing pre-trial order, the bases on which he would support such a negligence claim against Villavaso or Copelin. Plaintiff does not allege, for example, the times, dates, places or circumstances from which these defendants would or should have discovered that this contract had been changed before they did discover it or that Campo was transferring funds away from these firms. Without such allegations and evidence to support them, these alleged omissions cannot be actionable under Section 12(2) against these defendants. *See, Id.*

c. Section 10(b) and Rule 10b–5 Claims

Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b),[13] makes it unlawful to use any deception in contravention of rules and regulations issued by the SEC to protect investors and the public. In 1942, the SEC promulgated Rule 10b–5,[14] 17 C.F.R. § 230.10b–5, which generally prohibits fraud and misstatements or omissions of material fact in connection with the purchase or sale of securities.

■ The plaintiff has alleged violations of Section 10(b) against Copelin, Villavaso, Robinson and Thomas. He also alleges that if these defendants are not primarily liable under this section, they should be held derivatively liable for aiding and abetting violations of Section 10(b) and Rule 10b–5. Neither of these allegations can withstand summary judgment as to any of these defendants because no construction of the facts of this case would permit a finding that they had the scienter necessary to maintain these claims.

In *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375 [47 L.Ed.2d 668] (1976), the Supreme Court defined scienter as "a mental state embracing intent to deceive, manipulate, or defraud." *Hochfelder,* 425 U.S. at 193, n. 12, 96 S.Ct. at 1381, n. 12. The Fifth Circuit has not held, however, to a strict intentional misconduct standard for Rule 10b–5's scienter requirement. It has ruled that scienter in Rule 10b–5 civil suits for money damages is satisfied with a showing of severe recklessness. *Warren v. Reserve Fund, Inc.,* 728 F.2d 741, 745 (5th Cir.1984), *reh. denied,* 734 F.2d 1479 (5th Cir.1984); *Broad v. Rockwell International Corporation,* 642 F.2d 929, 961 (5th Cir.) (*en banc*), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506 [70 L.Ed.2d 380] (1981). The *Broad* court explained this standard as:

limited to those highly unreasonable omissions or misrepresentations that in-

---

**13.** Section 10(b) of the 1934 Act provides:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**14.** Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
(a) to employ any device, scheme, or artifice to defraud,
(b) to make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading, or
(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.

volve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it. *Id.* at 961–62.

Initially, the Court notes that plaintiff's amended complaint does not specify with particularity, as required by Federal Rule of Civil Procedure 9(b), the acts, omissions or misrepresentations upon which he bases these claims against these defendants. Assuming, however, that the fraudulent misrepresentations and omissions he is referring to are the same as those referred to in Count II of his amended complaint, as set forth on pp. 9–10 of the amended complaint, the Court notes that it has heretofore held that plaintiff has not provided sufficient evidence to support Section 12(2) claims against Copelin and Villavaso as to these misrepresentations and omissions even under that section's lower negligence standard of culpability. Therefore, he certainly has provided no evidence that could cause a factfinder to conclude that Copelin and Villavaso knew that these statements were false or that they intentionally did not tell them to the plaintiff or that these statements or omissions "presented a danger of misleading [plaintiff] which was either known to [Copelin and Villavaso] or was so

obvious that [Copelin and Villavaso] must have been aware of [them]." *Id.* The scienter requirement as to these allegations cannot be met as to Robinson and Thomas either because plaintiff offers no evidence to rebut the evidence supplied by these defendants that they did not discuss any of the matters covered in these alleged misstatements or omissions[15]. Plaintiff's claims under this section and rule cannot withstand summary judgment.

█ A *prima facie* case of aiding and abetting a violation of Rule 10b–5 requires a showing of the existence of the predicate Section 10(b) violation by the primary party, knowledge of the violation by these defendants and "substantial assistance" by the defendants in aiding and abetting the violation. *Woodward v. Metro Bank of Dallas*, 522 F.2d 84 (5th Cir.1975). Since the Court has held that all defendants alleged to have committed substantive Section 10(b) violations are entitled to summary judgment on that claim, none of these defendants can be held liable for aiding and abetting. There is no primary violation to aid and abet. *See, Congregation of the Passion, Holy Cross Province v. Kidder, Peabody & Co., Inc.*, 800 F.2d 177, 183 (7th Cir.1986).

### d. Section 15 of the 1933 Act and Section 20 of the 1934 Act Claims

█ Section 15 of the 1933 Act, 15 U.S.C. § 77o[16], imposes joint and several

---

**15.** Count IV of the plaintiff's amended complaint also alleges that these defendants "employed a scheme or artifice to defraud the plaintiffs (sic) by conspiring to bring securities onto the market which were not entitled to be marketed" and "engaged in acts, practices and/or a course of business which operated as a fraud or deceit, in the respects (sic), among others, set forth in the general allegations ..."

The Court cannot divine what the first quoted phrase means other than alleging a conspiracy to sell unregistered securities in violation of Section 12(1) of the 1933 Act. Assuming this reading is accurate, a Section 12(1) claim can only be maintained against a "seller" of securities, which Robinson and Thomas cannot be. *See, Swenson,* 626 F.2d at 425; *Doran,* 545 F.2d at 899. The Court has already ruled that no such claim can be proved against Copelin and Villavaso, whether acting alone or with anyone else.

The "acts, practices and/or course of business" language in the second quoted phrase is too obscure to address. To the extent plaintiff intends it to allege something other than the misstatements contained on pp. 9–10 of the amended complaint, the plaintiff has had more than enough time during this two year old lawsuit to discover and set out such facts if they exist and any such additional claims are hereby stricken. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511 [91 L.Ed.2d 202] (1986).

**16.** Section 15 of the 1933 Act provides:

Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under

liability upon controlling persons for the acts violating Sections 11 and 12 of the 1933 Act committed by persons under their control. Section 20 of the 1934 Act, 15 U.S.C. 78t[17], imposes derivative liability upon controlling persons attendant to violations of both express and implied remedies under the 1934 Act. To make out a *prima facie* case of a Section 15 or Section 20 violation against defendants Copelin, Villavaso, Robinson or Thomas, plaintiff must prove that 1) each had actual power or influence over the controlled person and 2) each induced or participated in the alleged violation. *G.A. Thompson & Co., Inc. v. Partridge*, 636 F.2d 945, 958 (5th Cir.1981); *Hill York*, 448 F.2d at 688. Once a *prima facie* case is made, defendants can avoid liability by affirmatively proving that their supervision was adequate and that they did not know of the conduct of the Section 12 violator nor could they have reasonably known of it. *Partridge*, 636 F.2d at 958; *Swenson*, 626 F.2d at 428.

Because the Court has found that plaintiff can maintain no Section 12 or Section 10 violations against either Villavaso or Copelin, none of the defendants can possibly be held liable under Section 15 since there are no actual violators of the securities laws to be held liable with. *See, Deviries v. Prudential–Bache Securities, Inc.*, 805 F.2d 326, 328 (8th Cir.1986). Even if there were allegations of predicate violations surviving these motions, however, plaintiff could not maintain the Section 15 or 20 claims alleged because either these defendants cannot be held to be controlling persons within the meaning of these sections or the plaintiff has failed to rebut the evidence put forth that the named defendants did not have the knowledge requisite for liability under these statutes.

■ 17 C.F.R. § 230.405 defines "control" for purposes of the securities laws as:

> the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.

Under this definition, neither Robinson, Thomas nor Villavaso can be found liable under Sections 15 or 20. The only relationship Thomas had to either New South or General Imaging, the two firms that are the subject of potential Sections 12 or 10(b) violations in this case, was that he owned a minority position in these firms. Plaintiff has not alleged, and there is no proof to support a contention, that Thomas had any influence at all over the corporate policies pursued by these firms or that he knew about any of the acts alleged to give rise to Section 12 or 10(b) violations. *G.A. Thompson & Co., Inc.*, 636 F.2d at 957–58.

■ While Robinson was a director of New South, this status alone will not automatically cause him to be deemed a Section 15 or 20 controlling person. He must be found to have influence over at least the

---

sections 77(k) or 77(*l*) of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

**17.** Section 20 of the 1934 Act provides:
(a) Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

(b) It shall be unlawful for any person, directly or indirectly, to do any act or thing which it would be unlawful for such person to do under the provisions of this chapter or any rule or regulation thereunder through or by means of any other person.
(c) It shall be unlawful for any director or officer of, or any owner of any securities issued by, any issuer required to file any document, report, or information under this chapter or any rule or regulation thereunder without just cause to hinder, delay, or obstruct the making or filing of any such document, report, or information.
The Court notes that plaintiff does not specify which subsection of Section 20 he alleges in Count V of his complaint. Because the Count alleges derivative liability, however, the Court shall treat it as a claim under subsection (a).

direction of the firm. *Id.* Robinson provides evidence that he had no knowledge of the operations of New South, including in what manner new funds were being raised. Plaintiff attempts to rebut this evidence by pointing the Court to deposition testimony that shows Robinson was a New South director and that he gave his proxy to Campo to vote at a shareholders meeting. Plaintiff's evidence is not inconsistent with that provided by Robinson that he was unaware of the New South's workings; other than his position as a director (which, standing alone is insufficient) there is no evidence he was able to influence the firm's direction. Plaintiff cannot maintain these claims against this defendant. *See, Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555.

Villavaso cannot be a controlling person because the evidence demonstrates that, like Thomas, he was not a director or officer of New South or General Imaging but was only a nominal shareholder of the latter. His unrebutted testimony is that he tried numerous times to obtain information concerning the financial conduct of New South, of which he was employed as an accountant, but was always rebuffed by Campo. Plaintiff cannot maintain these claims against Villavaso under these facts.

■ For similar reasons, Copelin, although an officer and director of both New South and General Imaging, cannot be found liable under Sections 15 or 20. As with Villavaso, Copelin's unrebutted deposition testimony is that his attempts to discover information about the conduct of Campo and General Imaging officers that now serve as the basis for the Section 12 and 10(b) claims asserted in this suit were rebuffed until July 1986. At that time, he told Dennis of the nullification of General Imaging's contract with Independent Network immediately after learning of it himself. Copelin and Dennis then secured both firms' financial records and uncovered all the misdealings alleged in this suit. Even though a director, there is no showing that Copelin had the requisite power, required for a finding of a Section 15 or 20

control person, to direct either corporation. *Id.*

Even if plaintiff's claims could stand on this ground, Copelin has provided unrebutted evidence that, after taking reasonable steps to investigate the conduct of both firms, he could not find out about any of the alleged acts or omissions that might support a Section 12 or 10(b) claim. Plaintiff has offered no evidence to controvert this. *Partridge,* 636 F.2d at 958; *Swenson,* 626 F.2d at 428.

In short, plaintiff has failed to come forward with any evidence to rebut the overwhelming evidence indicating that Campo shared his dominion over New South and General Imaging with none of the moving defendants. *See, Bernstein v. Crazy Eddie, Inc.,* 702 F.Supp. 962, 979 (E.D.N.Y. 1988). The claims against them based on sections of the 1933 and 1934 Acts conferring derivative liability cannot withstand summary judgment.

### B. RICO claims

■ Dennis has alleged violations of RICO (Count VI) against Copelin and Villavaso. Specifically, Dennis alleges that these defendants violated 18 U.S.C. §§ 1962(b) and (c) which provide:

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

In order to prove a violation of either of these provisions, plaintiff must prove, as a necessary element, "a pattern of racketeering activity" or of a "collection of an unlawful debt." *H.J., Inc. v. Northwestern*

*Bell Telephone Co.,* —— U.S. ——, 109 S.Ct. 2893, 2897 [106 L.Ed.2d 195] (1989). "Racketeering activity" is defined in RICO as "any act or threat involving" certain enumerated state law crimes or any "act" indictable under specified federal statutes and certain federal "offenses." 18 U.S.C. § 1961(1). The acts comprising the racketeering activity are commonly known as predicate acts. The term "pattern" is defined as "requir[ing] at least two acts of racketeering activity" within a ten year period." 18 U.S.C. § 1961(5).

Copelin and Villavaso attack plaintiff's RICO claims against them by arguing that plaintiff cannot meet his burden of proof on the "pattern" element since their conduct cannot be tied to any predicate acts that withstand judicial scrutiny and because plaintiff cannot prove a pattern of racketeering activity. Because the evidence now before the Court shows that plaintiff cannot associate these defendants with a pattern of racketeering activity, even construing all disputed facts in plaintiff's favor, summary judgment is warranted in favor of these defendants.

None of the four sets of predicate acts cited by plaintiff in his complaint (Doc. 1), amended complaint (Doc. 11) and RICO case statement (Doc. 30)—three instances of mail fraud, thirty one wire fraud violations, violations of federal securities laws and misappropriation of funds—supports his RICO allegations.

For reasons set forth herein above, the Court has granted summary judgment as to all the securities claims alleged, therefore they cannot constitute RICO predicate acts.

Plaintiff's allegation of mail fraud is clearly inadequate. The crime of mail fraud, 18 U.S.C. § 1341,[18] requires that the mailing in question be in furtherance of the scheme to defraud. *United States v. Maze,* 414 U.S. 395, 403, 94 S.Ct. 645, 649 [38 L.Ed.2d 603] (1974). Plaintiff does not allege that the three letters cited contributed to the defendants' efforts to separate him from his money and the evidence demonstrates that they did not do so. These letters only provided notice of board meetings and contain no information that Dennis alleges is fraudulent or in anyway contributes to the fraudulent scheme.

In addition, the three letters cited were written after April 21, 1986, the date of Dr. Dennis' last investment in General Imaging and New South. A mailing occurring after completion of the allegedly fraudulent scheme cannot support a mail fraud allegation because it does not contribute to completion of the fraud. *See, Maze,* 414 U.S. at 403, 94 S.Ct. at 649 (1974); *Henderson v. United States,* 425 F.2d 134 (5th Cir.1970). These mailings cannot, then, serve as predicate acts for a RICO violation.

Nor can plaintiff's allegations of wire fraud support his RICO claims. Federal courts have construed the federal wire fraud statute, 18 U.S.C. § 1343,[19] to require that the transmission alleged to perpetuate the fraudulent scheme be accomplished between different states. *Smith v. Ayres,* 845 F.2d 1360, 1366 (5th Cir.1988).

In this case, plaintiff does not allege that any of the thirty one telephone calls he cites as separate incidents of wire fraud were made interstate and there is no evidence to support a finding that any of them were interstate calls. In their affidavits,

---

**18.** 18 U.S.C. § 1341 provides, in pertinent part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses ... for the purposes of executing such scheme or artifice or attempting to do so, places in any Post Office or authorized depository for mail matter, any matter or anything whatsoever to be sent or delivered by the Postal Department ... shall be fined not more than $1,000.00 or imprisoned not more than five years or both.

**19.** 18 U.S.C. § 1343 reads, in pertinent part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses ... transmits or causes to be transmitted by means of wire ... communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000.00 or imprisoned not more than five years, or both.

Villavaso and Copelin swear that none of the calls they made to plaintiff or Campo originated outside of Louisiana and both Campo and Dennis admit by deposition that they received these calls in Louisiana. There is no basis for concluding that these calls can amount to violations of the § 1343 and so they cannot serve as predicate acts for the RICO count in this case.

■ The last predicate acts alleged involve the transfers of funds between New South and General Imaging and Campo, FMCCA, Villavaso, Copelin and Marketing Services. Plaintiff claims that these transfers violate the Louisiana statute prohibiting misappropriation of funds, La.Rev.Stat. Ann. § 14:67 (West 1972).[20]

It is far from certain that such acts can serve as RICO predicate acts since theft is not one of the enumerated state law offenses that constitute racketeering activity. 18 U.S.C. § 1961(1)(A). In addition, Villavaso and Copelin have produced evidence (unrebutted by the plaintiff) that the payments they received from New South and General Imaging were either reimbursements for expenses advanced on behalf of these corporations or were payments for services actually rendered. Either way, the lack of culpable *mens reus* of taking without consent or by fraud defeats the use of such payments as elements of a state law offense founded on Section 14:67 of the Criminal Code, and therefore as predicate acts for RICO allegations against these defendants.

Copelin admits that Marketing Services received from December 31, 1985 through March 3, 1986 five checks drawn on New South's bank that totalled $60,320.02. Uncontroverted deposition testimony submitted to the Court indicates that these monies simply reimbursed Marketing Services for payments advanced on New South's behalf to pay contractors renovating the warehouse New South rented and to pay employee salaries, utility bills and other New South operating expenses. (Doc. 72, Exh. 17, pp. 47–53). Similarly, the $16,654.41 paid to Villavaso from New South represented payment of his contractual salary for performing accounting services for the firm and reimbursing him for payments he advanced on New South obligations (Id., Exh. 19, 97–107). Plaintiff does not refute these explanations for the use of those funds. Because unsupported assertions are not sufficient, when challenged by appropriate evidence submitted on summary judgment, to create an issue of material fact, the misappropriation allegations cannot serve as a predicate act for the RICO claim. *Matter of Lewisville Properties, Inc.*, 849 F.2d 946, 951 (5th Cir.1988).

## C. Pendant State Law Claims

■ All movers have also mounted cursory challenges to the plaintiff's state law allegations against them. Because they cite no relevant state authority for their positions, the Court has no ground upon which to find that they are entitled to judgment upon these claims. Accordingly,

IT IS ORDERED that:

1. The Motion To Dismiss And/Or Motion For Summary Judgment On Behalf of Defendants Sherman Copelin and Lloyd Villavaso is GRANTED as to Counts I, II, III, IV, V, VI and DENIED as to Counts VII, VIII and IX;

2. Defendant Ignatius Thomas' Motion For Summary Judgment is GRANTED as to Counts III, IV, V and VI and DENIED as to Counts VIII and IX;

3. Defendant Carl Robinson's Motion For Summary Judgment is GRANTED as to Counts III, IV, V, and VI and DENIED as to Counts VIII and IX.

4. The pendant state law claims—that is, Counts VII, VIII and IX as to defendants Sherman Copelin and Lloyd Villavaso and Counts VIII and IX as to defendants

---

**20.** Section 14:67 provides, in pertinent part:
Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential.

Ignatius Thomas and Carl Robinson—are DISMISSED without prejudice. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139 [16 L.Ed.2d 218] (1966).

George Arceneaux, Jr.